### THE POZNAN.

(District Court, S. D. New York. July 9, 1921.)

1. **Shipping ☞115—Matters which will excuse performance of contract of carrier.**

   To excuse performance under a contract of affreightment altogether, and leave the promisee without remedy for his loss, the intervening event which prevents performance must be so unexpected as to be outside any contingency which, had the parties been faced with it, they would have agreed that the promisor should undertake.

2. **Shipping ☞115—No excuse for failure to unload cargo.**

   Where congestion at destination was perfectly well known when cargo was accepted, there was no such excuse for failing to deliver and unload the cargo and for returning to port of shipment, by reason of such congestion, as would relieve the ship from its obligation to unload at the port of discharge.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Shipping ⊂⟹113—Authority in bill of lading, permitting discharge at port other than that of discharge, scrutinized with care.**

An article in a contract of carriage, giving the master of a vessel the broadest discretion to terminate the venture and discharge the ship at that port which most nearly will fulfill the contract, should be scrutinized with care.

4. **Shipping ⊂⟹141(1)—"Civil commotion" and "disturbance" in contract of carriage did not mean economic disturbance.**

The words "civil commotion" and "disturbance" in an article in a contract of carriage giving master right to discharge cargo at some other port than that of discharge in case of civil commotion, disturbance, etc., at the port of discharge, referred to political disorders which prevent a ship from safely approaching a port or from getting assistance in discharging the cargo, and did not relate to congestion or crowding due to an economic disturbance that resulted in merchants being unable to pay for goods and remove them from berths and warehouses.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Disturbance; Words and Phrases, Civil Commotion.]

5. **Shipping ⊂⟹141(1)—Contract of carriage held not to excuse nondelivery due to congestion at port of discharge.**

An article in a contract of carriage, excusing failure to discharge cargo in case of civil commotion, disturbance, blockade, or interdict of the port of discharge, warlike or naval operations or demonstrations, or ice or closure by ice, "or other circumstances (whether existing or anticipated)," did not excuse a failure to discharge occasioned by congestion, due to deficiency of wharves, warehouses, or lighters.

6. **Shipping ⊂⟹125—Ship responsible for deviation.**

Where a ship without excuse deviates under contracts of carriage, she is responsible for any results arising therefrom.

7. **Shipping ⊂⟹115, 125—Return to port of shipment a deviation.**

Where a ship without excuse returned to port of shipment, there was a total abandonment and deviation, even if the owner of the ship intended to transport the goods to port of discharge by another bottom.

8. **Shipping ⊂⟹140—Ship's liability for loss limited by exceptions in contract before deviation.**

Until a deviation, liability of ship for loss or injury to cargo is limited by the conditions in its contract of carriage, but after such deviation she becomes an insurer.

9. **Shipping ⊂⟹132(3)—Burden on ship to prove losses fall within exceptions in contract of carriage.**

Where cargo is lost or injured, the burden is on the ship to prove that the losses fall within exceptions limiting its liability found in the contract of carriage.

10. **Shipping ⊂⟹141(1)—Liability limited by exceptions as to theft and breakage.**

Under exceptions in a contract of carriage against loss by theft and by breakage, ship is not liable for thieving by stevedores employed by contractors engaged by the ship, where due diligence was used.

11. **Shipping ⊂⟹132(3)—Ship has burden of proving loss occurred before deviation.**

Where contract excepted ship from losses by thieving and breakage, and there was a deviation by the ship and a return to port of shipment without discharge of cargo, the ship will stand charged with whole loss occasioned by thieving and breakage during the whole voyage, unless it can prove that the thieving or breakage occurred before the deviation.

12. **Shipping ⊂⟹106—Charterer's bill of lading bound ship for right delivery.**

Where charter party did not provide that master should sign bills of lading, and provided that charterer should issue no bill of lading until

⊂⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

freight had been paid to the owner, but clearly contemplated bills of lading running in the name of the charterer, and they all so read, the ship, once laden, was bound for right delivery.

13. **Shipping ⊚⇒53, 62—Charterer liable for bills of lading signed by it.**

A charterer was liable for all bills of lading signed by it, and those signed by the master of the vessel with its consent and in its name, having no right to compel the master to sign for the owner under the charter party; and, the venture being primarily the charterer's, he would be liable, even though master signed bills of lading for the owner.

14. **Shipping ⊚⇒53—Owner not liable under bills of lading signed by charterer.**

Owner of a vessel is not liable under bills of lading, not purporting to bind it, issued in the name of the charterer, which under the charter party was the only party bound to sign, even as to bills of lading actually signed by the master in the charterer's name while acting as charterer's servant.

15. **Shipping ⊚⇒53—Owner of vessel held not liable under bills of lading.**

Owner of vessel was not liable under bills of lading signed by charterer, though it kept a representative at the office of the charterer, carefully supervising the issuance of all bills of lading and taking all the checks, where this was done in pursuance of its agreement by the charter, by which it was to have all the freight as security for the hire of the ship in question and others.

16. **Shipping ⊚⇒53—Owner liable for results of causing chartered ship to return without discharging.**

The owner of a chartered ship was liable in tort to shippers, where it ordered the master to return with the ship to port of shipment without discharging cargo, as required by bills of lading issued by charterer.

17. **Admiralty ⊚⇒22—Tort causing deviation within jurisdiction of admiralty court.**

Where tort of owner of chartered vessel consisted of an order to master on land resulting in deviation by ship, the injury being a breach of the contract of carriage between shippers and charterer, the admiralty court has jurisdiction of a libel against such owner.

18. **Shipping ⊚⇒131—Owner not liable for pilfering after deviation occasioned by its tort.**

Where owner of chartered vessel was guilty of tort in occasioning the deviation of the ship and its return to port of shipment, subsequent pilfering from cargo at port of shipment, though in fact a consequence of the deviation, was too remote to be its legal result, and owner was not liable therefor to shippers under bills of lading signed by charterer.

19. **Shipping ⊚⇒120—Ship liable for pilfering from cargo while in charge of marshal.**

Ship and charterer were liable to shippers for pilfering from cargo while the ship was in the charge of the marshal, where he was only in technical possession thereof.

20. **Shipping ⊚⇒132(3) —Burden of proof concerning pilfering from cargo.**

Where owner of chartered ship caused its deviation and its return to port of shipment, shippers under contracts with charterer have the burden, as against the owner, of showing that pilfering occurred while such owner had charge of the cargo.

21. **Shipping ⊚⇒131—Owner, causing deviation of chartered ship, only liable for proximate consequences.**

Owner of chartered ship, which tortiously causes its deviation and breach of contract of carriage between charterer and shippers is liable only for the proximate consequences of its tort, and if the ship at the time could not have made right delivery at port of discharge or some other proper port under the contract, the tort did not injure shippers,

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and their relief can then rest only in contract, but if the ship could have delivered, the consequence of the order is the shippers' loss in getting delivery at port of shipment as against delivery at port of discharge when delivery could have been made after the tortious deviation.

**22. Shipping ⏠53—Immaterial as to liability of owner for tort that charterer would have committed same wrongful act.**

Where owner of chartered vessel tortiously ordered its return from port of discharge to port of shipment without discharge of cargo, such owner cannot argue as against shippers that the charterer would have returned independently of any order by the owner, and would have caused equal loss to shippers.

**23. Shipping ⏠131—Measure of damages for tortious deviation.**

Where ship breaches its contract to discharge cargo at port of discharge and returns to port of shipment, the measure of damages to shippers is the difference in value of the goods at port of discharge, delivered at a reasonable time after the ship arrived there, and their value in port of shipment when delivered, and this may or may not correspond with the cost of carriage from port of shipment to port of discharge, and the amount of the prepaid freight has nothing to do with it, and what was a reasonable time for delivery depends upon when, with reasonable efforts, the ship could have discharged.

**24. Shipping ⏠131—Measure of damages for deviation of ship occasioned by tort of third person.**

Where owner of chartered vessel tortiously ordered master to return the ship to the port of shipment after it reached the port of discharge, such owner is not responsible upon the basis of any possible discharge before it intervened and ordered the return of the ship, that is, the owner is not charged in personam in favor of shippers, under bills of lading signed by charterer with any affirmative obligation, the consequences of its tort being only the possible discharge which it actually prevented, the measure of damages being otherwise the same as that for breach of contract by charterer.

In Admiralty. Libel by the John B. Harris Company and others against the steamship Poznan and others. Cause referred to special commissioner.

This case comes up upon a great number of libels filed by shippers of cargo upon the S. S. Poznan against the ship in rem and the owner and charterer in personam. The ship was owned by the Polish-American Navigation Company, which chartered her to the Acme Operating Company on September 6, 1920, for a round trip, New York to Havana, Cuba, on a time charter, government form, at a hire of $67,500 a month, payable in advance. The charter was executed concurrently with another agreement of the same date, which arose from the following circumstances: The Polish-American Company had earlier chartered to the Acme Company two steamers, the Krakow, on July 3, 1920, and the Ida, on July 17th. On the 6th of September about $31,000 hire was due on the Krakow, and about $40,000 on the Ida. By the collateral agreement the Acme Company assigned to the Polish-American Company all freights received on the Poznan up to the sum of $275,000 as security for the hire already due and any further hire which should become due on any of the three vessels. Any excess of freights received over $275,000 and up to $350,000 were to be deposited by the Acme Company in a special account in its own name and that of the Polish-American Company as further security. The charter likewise provided that the charterers should issue no line bill of lading for cargo loaded until cash had been paid to the Polish Company, except bills of lading not exceeding $10,000.

The ship received about 13,000 tons of freight, and issued bills of lading, in the charterer's name, most of which were signed by the charterer except

a few by the master. The charges were calculated by weight or measurement, with an addition of·90 cents per hundred pounds, the significance of which the parties dispute, the libelants asserting that it was to insure delivery at Havana, while the Polish and Acme Companies declare that it was against possible demurrage in Havana. During all the time of loading the Polish Company had a representative, a clerk, in the Acme office, who checked the bills of lading and saw that all checks received—the freight being paid in advance—were at once indorsed over to the owners. In this way some $307,000 of moneys was received, including, however, in that sum, $50,000 of obligations, not cash, from one shipper.

The bills of lading were in usual form, and contained the following provisions relevant in the suit:

"The carrier shall not be liable for loss or damage occasioned * * * by robbers and/or thieves."

Again:

"8. * * * In case of war, hostilities, civil commotion, disturbance, blockade, or interdict of the port of discharge, warlike or naval operations or demonstrations or ice or closure by ice, or other circumstances (whether existing or anticipated) which in the opinion of the master give rise or are likely to give rise to delay or difficulty in reaching, discharging at or leaving the port of discharge, the master is to be at liberty in his absolute discretion to proceed to and discharge the cargo at such other port or ports as he thinks advisable under the circumstances; and thereupon the cargo shall be at the sole risk and expense of the receivers, and the ship and the ship owner shall be free from all responsibility in respect thereof."

Finally:

"18. * * * Owing to conditions of war or hostilities existing or threatened, this shipment is accepted at the sole risk of the owners thereof of arrest, restraint, capture, seizure, detention or interference of any sort by any power; and the carrier and its representatives are privileged in its or their absolute discretion, if deemed advisable for the protection of the vessel or of any carrier or to avoid loss, damage, expense, delay or other disadvantage, either with or without proceeding to or toward the port of discharge or, entering or attempting to enter or discharge the goods there, whether such entry or discharge be permitted or not, to proceed to any other port or ports or return to the port of shipment once or oftener in any order or rotation, retaining the goods on board or discharging the same at risk or expense of the owner thereof at any such port or ports at the first or any subsequent call, and full bill of lading freight, together with extra compensation for additional transportation and all other charges shall be paid by the shipper, consignee and/or assigns and shall be a lien on the goods."

The ship loaded in the North River at 131st and 133d streets and eventually cleared on October 3d, arriving at Havana on the evening of October 8th. Application for entry at the Custom House was made on the next day, but she could not be entered, because she presented but one sheet of her manifest, which consisted of 70 sheets. The other 69, having been left behind in the hurry of her departure, though at once sent by mail, were not received until November 11th, through some delay in the Cuban Post Office.

When the Poznan arrived in the harbor it was found to be extremely crowded with vessels, and she lay 'at anchor until November 25th, when by order of the owners she returned with her cargo unbroken to New York. Meanwhile, the master and Mr. Nevelson for the owners, who had arrived at Havana towards the end of October, made various efforts to obtain a berth, the sufficiency of which was a subject of most of the dispute at the hearing. The libelants insist, and the respondents deny, that there were at least four wharves at which she could have berthed, and which for convenience may be called Castellanos, Altares, United States and Cuba, and Paula. It is impossible to set out the evidence upon this issue in any reasonable compass. Nevelson while at Havana also made some inquiry as to the possibility of discharging the ship at other Cuban ports, but concluded that this also was impossible, a conclusion also contested by the libelants. It was at the end of

these inquiries, and after he had got back to New York and made some efforts there, that he directed the ship to return.

The crowded condition of the harbor of Havana had existed throughout the summer of 1920, was well known to the Acme Company and the Polish Company, on September 6th, was reflected in the unusually high charge of 90 cents per hundred pounds either for landing or demurrage. The Krakow had left New York in July, and was burned at Havana on October 18th before finishing her discharge. The Ida left later and arrived in August, but could not secure a berth until October 22d. The difficulties of discharge in Havana were, moreover, known. not only to those companies, but generally among shipping people. During the month of September there was some indication that the situation was better, but probably it grew worse in October, though that question is in some dispute. Acting upon his knowledge of this situation, Stafford, president of the Acme Company, had entered into a more or less definite agreement with one Guidera for the use of a wharf before the Poznan sailed, which came to nothing. Stafford in addition bought some barges of the Shipping Board which were never delivered, and swore that he had two other barges under charter from another. The Acme agent in Havana was one La Villa, who had for one reason or another allowed the charterers' credit to become bad in Havana by his failure to pay past charges, a failure which undoubtedly increased the ship's difficulties.

On October 10th, the day after the Poznan arrived, the Cuban Republic declared a moratorium on all obligations, including those of the banks, which could thereafter be required to pay but 10 per cent. of their deposits. Its effect upon the discharge of vessels in the harbor is in dispute, the libelants arguing that it had little or no effect, while the respondents insist that they become decidedly worse, owing to the fact that merchants were unwilling or unable to meet their commitments. The official documents show that the discharges became relatively less in October and November than they had been in September, and for the moment anyway it undoubtedly tended to prevent the removal of freight from the bonded warehouses. How long this operated, or how important an influence it was, it is impossible to ascertain.

The Poznan docked in New York on her return on December 2d. and the shippers at once began to file possessory libels for the cargo, as well as the libels in suits for damages. The ship was arrested at once, and under order of court the cargo was taken away by the shippers upon giving stipulations for any damages to the ship. Though the Poznan was therefore in custody of the court, the Acme Company was not by order relieved of the duty to deliver, and proceeded to do so until February 3d, the delay being due to the extreme confusion with which unloading was made. Upon broaching the hatches the cargo was found to have been much more extensively damaged than is usual in such cases, but the details are too complicated to be set forth. Because of this damage and of the stowage as actually observed during discharge the libelants allege negligence and claim damages. The testimony is in dispute. Both on loading and discharge the stevedores pilfered largely, and there was in consequence a substantial shortage in the cargo. This the libelants assert to be due to negligent watching, and make the basis of a claim for damages.

The claims for damages are therefore made up first of the damages for delivery in New York, including: (1) In the case of goods reshipped, (a) the cost of carriage to Havana, (b) the difference in the value of the goods when they finally were discharged at Havana and their value at that port in November, 1920; (2) in the case of goods sold in New York, the difference in value between the value delivered in Havana in November, 1920, and the price realized here. Besides these, in all cases the libels claim loss from negligent stowage, and the shortage due to pilfering. All these claims are asserted against the Acme and Polish companies personally, as well as against the Poznan in rem.

The libelants consolidated all their libels into one, upon which the evidence was taken. This libel was then amended to include allegations that the Polish Company had persuaded the Acme Company to break its contract,

which was laid as an independent maritime tort. Much evidence was taken in Havana, and the case came on for hearing in court.

Walter C. Noyes, Ralph J. M. Bullowa, and Lawrence E. Brown, all of New York City, for claimant.

Frank E. Walsh, Harold Lee, of New York City, and Joseph A. McCaffrey, for charterer.

Hunt, Hill & Betts, of New York City (Geo. Whitefield Betts, Jr., and George C. Sprague, both of New York City, of counsel), for libelants John B. Harris Co. and others.

Burlingham, Veeder, Masten & Fearey, of New York City (Ray Rood Allen and Arthur Mayer, both of New York City, of counsel), for Davis and other libelants.

Harrington, Bigham & Englar, of New York City (Horace M. Gray, of New York City, of counsel), for libelants Quaker City Corporation and others.

Kirlin, Woolsey, Campbell, Hickok & Keating, of New York City (James H. Herbert and Robert S. Erskine, both of New York City, of counsel), for various libelants.

Duncan & Mount, of New York City (Russell T. Mount and Henry W. Dieck, Jr., both of New York City, of counsel), for Havana Central R. R. Co. and various libelants.

Haight, Sandford, Smith & Griffin, of New York City (James C. Webster, of New York City, of counsel), for Construction Supplies Corporation and others.

Samuel Frank, of New York City, for various libelants.

Joseph G. Cohen, of New York City, for various libelants.

Pratt, McAlpin & Page, of New York City (Ira C. Ramsburg, of New York City, of counsel), for various libelants.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for various libelants.

Rumsey & Morgan, of New York City (Mark W. Maclay, Jr., of New York City, of counsel), for various libelants.

LEARNED HAND, District Judge (after stating the facts as above). The first question is whether there was a breach of contract in failing to deliver the cargo at Havana, a question quite distinct from whether the prepaid freight must be returned. Every one agrees that the understanding to deliver as evidenced by the bills of lading was absolute except in so far as it was excused, and there are only two excuses offered: First, that the venture was frustrated by impossibility of performance; second, that performance was excused under the terms of the bills of lading themselves. For the sake of argument I shall assume for the moment that the respondents are right in saying that between October 9 and November 25, 1920, they had no opportunity of berthing the "Poznan" anywhere in the harbor of Havana, that they could not have discharged in lighters, and that there were no other Cuban ports which offered better advantages. If the bill of lading or the law excused them from delivery, they were right in returning to New York, but if it did not, they were still in duty bound to make right delivery at Havana, and they should have waited till a berth was avail-

able. This feature of the case arises later; it has nothing to do with the question whether there was excuse for breach, which I am now considering.

[1] The case is clearly not one of frustration within the rule of The Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960, The Claveresk (C. C. A.) 264 Fed. 276, and Bank Line v. Capel & Co., L. R. (1919) A. C. 435, and Tamplin S. S. Co. v. Anglo-Mex. Pet. Co. (1919) 2 A. C. 397. It is perhaps needless to repeat that these are but instances of the general rule that subsequent events, making the performance of a contract impossible, may be so unforeseen and so completely disappoint the expectation of the parties as to absolve the promisor from performance. The rule is, it is true, generally put as though the question were one of intent, but this is, strictly speaking, untrue. The parties have no intent whatever on the subject, because they assume that performance will take place, and are ordinarily not thinking of the promisor's failure. Yet any promisor recognizes that his performance is subject to some risks, which may prevent fulfillment, and such risks he must be understood as accepting when he makes the promise. Day v. U. S., 245 U. S. 159, 161, 38 Sup. Ct. 57, 62 L. Ed. 219. To excuse performance altogether and leave the promisee without remedy for his loss, courts have always found it necessary, though with various degrees of strictness, that the intervening event which prevents performance shall be so improbable as to be outside any contingency, which, had the parties been faced with it, they would have agreed that the promisor should undertake. Chic., M. & St. Paul v. Hoyt, 149 U. S. 1, 14, 15, 13 Sup. Ct. 779, 37 L. Ed. 625; Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 543, 23 Sup. Ct. 754, 47 L. Ed. 1171; Carnegie Steel Co. v. U. S., 240 U. S. 156, 165, 36 Sup. Ct. 342, 60 L. Ed. 576; Sun Printing & Pub. Assoc. v. Moore, 183 U. S. 642, 655, 22 Sup. Ct. 240, 46 L. Ed. 366; Berg v. Erickson, 234 Fed. 817, 148 C. C. A. 415, L. R. A. 1917A, 648 (C. C. A. 8th). Prima facie he is bound, however impossible it may be for him to perform, and as Prof. Williston (Williston on Contracts, § 1937), says, the exceptions which have grown up since the middle of the nineteenth century, whether phrased as "implied conditions," or as "the intent of the parties," are in truth no more than equitable modifications of the agreement. They depend, not upon a better understanding of what the parties said, but upon declining to enforce the undertaking in cases which lead to extravagantly unfair results.

[2] In the case at bar there is no reason whatever to excuse the ship. All the conditions in the harbor of Havana were perfectly well known in September, 1920, when the cargo was accepted. Indeed the Acme Company, just because of those conditions, tried to get a special wharf from Guidera and to have lighters and hulks on hand in which to discharge. No one will be hardy enough to suggest that the failure of those negotiations would excuse, especially as an unusual rate was charged against them, nor would there be the slightest ground to entertain the defense at all, except for the promulgation of the moratorium on October 10th. If this were the cause of the ship's default, it might well be that the case was one of frustration, because that might possibly

be so unexpected an event as to be fairly beyond the range of any putative "intent" of the parties. At least I shall assume as much, and take up the question of the actual effect of the moratorium upon the situation. Unfortunately, though perhaps necessarily, the evidence is vague, and it is also conflicting.

The only way in which the moratorium could have played a part, and this I understand to be conceded, is by preventing merchants from withdrawing their goods from the "habilitated" warehouses or the lighters, thus keeping these full of goods. A fair test of its effect should therefore be the daily withdrawals of goods through the Custom House before and after October 10th. Importations into the port of Havana we should also expect to fall off after the moratorium, though apparently that was exactly what did not happen, but that consideration is irrelevant, because any crowding which was due to importations after the Poznan arrived makes no difference. She was chargeable with getting the benefit of the date of her arrival, and in so far as the delay in receiving the manifest prevented her from doing so, she is to blame. The question really becomes this: What was the mass of accumulated merchandise of which she must await the withdrawal, and how far was that withdrawal delayed by the moratorium?

The figures given by Yero in his general list show September packages withdrawn at 1,421,000, October, 1,155,000, November, 1,207,000. In his detailed statement given later the footings for September and November are about the same, but those for October are 1,550,000, of which 474,000 were before October 10th, and 1,076,000 for the balance of the month. The discrepancy is not accounted for. If the later list be taken, the daily average of withdrawals from September 1st to the date of the moratorium was about 56,000 and from the moratorium to December 1st about 50,000. The daily withdrawals in October after the moratorium were nearly 60,000. On these figures it would appear that the moratorium did not stop withdrawals from the warehouses and lighters at all. If the first figure for October be taken and divided by 3, the daily figure for September and the first third of October is 53,000, for the last two-thirds of October and November is a little less than 44,000 and for the last two-thirds of October alone about 43,000.

Accepting the earlier figures as most favorable to the ship, there is still no reason to attribute to the moratorium any such effect as could possibly be deemed a frustration of the enterprise. There was some slackening in the withdrawals, say an average of 10,000 packages a day, i. e., 260,000 in a month, which would have delayed her about a week to work off at the rate of withdrawal during the last two-thirds of October. It would be absurd to treat this increased difficulty and delay as terminating the whole contract.

My conclusion, therefore, is that the conditions in October after the moratorium were not substantially different from what they had been during the summer. In October very large quantities did come in, and no doubt served still further to increase the congestion, but as I have said, this cannot fairly be taken in the ship's favor unless the neglect to furnish the manifest be ignored, which it should not be.

[3] The next question is whether articles 8 or 18 make an excuse.

Article 18 may be dismissed at once; it clearly refers only to circumstances arising out of war, and is not applicable to the situation at Havana last autumn. Article 8 is not subject to this limitation, being general in its application. It gives the master the broadest discretion to terminate the venture and discharge the ship at that port which most nearly will fulfill the contract. Obviously such an exception should be scrutinized with care, unless the charterer is to be free at pleasure, to disregard the whole purpose of the voyage. The rule that exceptions must be strictly construed (Compania La Flecha v. Brauer, 168 U. S. 104, 118, 18 Sup. Ct. 12, 42 L. Ed. 398) applies with exceptional force.

[4] No one can with much plausibility urge that the situation at Havana, even when the evidence is taken most favorably to the respondents, comes within any of the express exceptions in article 8. It was not the direct consequence of war, hostilities, blockade, warlike or naval operations or demonstrations, ice or closure by ice. There remain three conceivable exceptions; civil commotion, disturbance, or interdict of the port of the discharge. Yet it cannot be seriously argued that the crowded warehouses, berths and lighters at Havana were due to any of these. I can see little or no distinction between "civil commotion" and "disturbance," and if there be any, each refers to political disorders which prevent the ship from safely approaching the port or from getting assistance in loading or discharging from those on shore. "Disturbance" is no doubt the broader word, but it will not serve. In so far as the people of Cuba had ordered more goods than they had berths and warehouses to accommodate without delay, by no stretch can it apply. In so far as the crowding was due to the fact that merchants did not remove their goods because they could not pay for them, as eventually evidenced by the moratorium, it is indeed possible by a metaphor to speak of a "disturbance" as the cause. There was an economic disturbance, but that is certainly not what article 8 has in mind. Moreover, it is open to some doubt whether even so the cause would be proximate. The supposed sequence is that the merchants, being hard-pressed, refused to clear the warehouses; hence later ships could not discharge. Aside from the great doubt as to how far this circumstance operated in fact to prevent discharge, there is not a very direct relation between the economic stringency which put the merchants in this frame of mind and the actual clogging of the harbor. "Interdict" is of course in a political category.

There remains, therefore, only the general phrase, "other circumstances * * * which * * * are likely to give rise to delay or difficulty in * * * discharging." If these words are to be used in their bare grammatical meaning, then all that precedes was redundant, and the article as a whole gave the master the right to terminate the voyage for any reason as soon as he in good faith thought the discharge would be difficult or delayed. But nobody has ever thought that such a clause went so far as that. Yet the words must add something to the preceding specifications, and the question, of course, is how much. Lord Justice Farwell in Tillmanns v. Knutsford, [1908] 2 K. B. 385, 403–405, thought that it must be possible to find a single cate-

gory for all the preceding words, and that the general concluding language was to be taken as including all those instances not specified which that category would comprise. If so, then, as I understand the suggestion, you must find the genus determined by the greatest number of attributes common to all the specified instances, the greatest common divisor so to speak, and the general words comprise all instances not expressly enumerated. I am not at all satisfied that this, though a logical rule, is what the law will impute to the language. Lord Loreburn was more nearly correct perhaps when in Larsen v. Sylvester, [1908] A. C. 295, 296, he declined to attempt any final definition of what is after all only a canon of interpretation. I should suppose that the clause merely added a penumbra of meaning to each of the specified terms, so as to include similar things not literally covered by the terms themselves. Aktieselskabet Frank v. Namaqua Copper Co., Ltd., 25 Com. Cas. 212.

[5] Yet if Farwell, L. J., be right, still I think that this exception will not serve the respondents. Without the addition of the words, "ice or closure by ice," the article included only violent human interference, as was found in Tillmanns v. Knutsford, supra. The putative genus would as little include deficiency of wharves, berths, and lighters, or the failure to clear them with customary speed, as it included ice in the case cited. It is quite probable that "ice or closure by ice" was inserted just because of that decision. I am by hypothesis now to find a genus which shall include "ice" along with what went before. The items become, it is true, incongruous enough, but if logic is to be pressed to a conclusion, I think that all the items fall within the definition of an obstacle interposed between the ship and the port by the active agency of man or nature. Within such a genus the deficiency of wharves, warehouses, or lighters does not fall, any more than the deficiency of labor to discharge, usually covered by an exception against strikes and the like. Nothing here prevented the Poznan's unlivery except the absence of empty receptacles. True, it may be argued that the ships at the berths and the goods in the warehouses and lighters were physical obstacles, but the contract did not specify any particular berths; and the actual obstacles would not have prevented performance except for the scarcity of other means. This is quite another matter from blocking off the port by violence or by an obstacle like ice. Therefore, even accepting the rule of Farwell, L. J., the exception does not cover.

I have found no authorities in this country directly in point. The nearest is Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126 (C. C. A. 1st), a case involving delays caused by crowded berths. The exception read "strikes, lockouts, civil commotions or any other causes or accidents beyond the control of consignees," but the decision went off on another point, and there is little to indicate the court's opinion from what is said on pages 412, 413, of 142 Fed., 73 C. C. A. 502, 5 L. R. A. (N. S.) 126.

There are general expressions of the doctrine as in Hickman v. Cabot, 183 Fed. 747, 106 C. C. A. 183 (C. C. A. 4th), Board of Commerce v. Security Trust Co., 225 Fed. 454, 140 C. C. A. 486 (C. C. A.

6th), Bers v. Erie R. R., 225 N. Y. 543, 122 N. E. 456, and Krulewitch v. National Importing Co., 195 App. Div. 544, 186 N. Y. Supp. 838 (1st Dept.), but in no case are the facts near enough to be of much assistance here.

The English cases are more directly in point. In Re Richardson & Samuel, L. R., [1898] 1 Q. B. 261, the steamer was delayed in loading due to the fact that workmen, who had been paid off, when the railway service was interrupted, could not be reassembled in time to discharge the ships in season. Thus the berths remained crowded and the steamer had to wait her turn. The charter party contained the following:

"The act of God, the Queen's enemies, war, riots, floods, strikes, lockouts, accidents to railway factories or machinery loss or damage from fire on board in hulk or craft or on shore, arrests and/or restraint of princes rulers and people or other causes beyond charterer's control."

The Court of Appeal held that the delay due to dismissing the hands did not fall within these exceptions, being for the charterer's own purposes. Neither was it a lockout, nor ejusdem generis with a lockout. A. L. Smith, L. J., further added that the delay arising from loading in the order of arrival was not within the general clause. Insofar as the case may be disposed of on the first ground, possibly it is not pertinent, but the judges clearly intended it to rest in part anyway on the second and third, and in so far as it does, it is closely in point.

In Thorman v. Dowgate S. S. Co., L. R., [1910] 1 K. B. 410, the ship lost time through being obliged to wait her turn through a block in the harbor, precisely as in the case at bar. The charter party contained by reference the words:

"Strikes of pitmen or workmen, frosts or storms, and delays at spouts caused by stormy weather, and any accidents stopping the working, loading, or shipping of the cargo, also restrictions or suspensions of labour lockouts delay on the part of railway either in supplying wagons loading the coals, or any other cause beyond my control."

Lord Sumner (then Hamilton, J.) held, relying partly on In re Richardson & Samuel, supra, that the concluding clause must be construed ejusdem generis with what went before and that the defendant, the charterer, was not excused for the delays, and must pay demurrage. The case appears to me on all fours with that at bar.

In Northfield S. S. Co. v. Compagnie l'Union des Gaz, L. R., [1912] 1 K. B. 434, the steamer was prevented from discharging because the berths were all taken and the port rule of the shore laborers forbade their working except upon berthed ships. The charter party had an exception as follows:

"In case of strikes, lockouts, civil commotions, or any other causes or accidents beyond the control of the consignees which prevent or delay the discharging," etc.

The delay was held by the Court of Appeal to be on charterer's account under the rule ejusdem generis. Aktieselskabet Frank v. Namaqua Copper Co., Ltd., 25 Com. Cas. 212.

The last three cases dispose of the suggestion that Larsen v. Sylvester, L. R., [1908] A. C. 295, in which the words were "accidents or

hindrance of what kind soever," changed the rule of ejusdem generis as applied to this class of cases. Indeed, the House of Lords, shortly after Larsen v. Sylvester, applied it in S. S. Knutsford Ld. v. Tillmanns & Co., L. R. (1908) A. C. 406, supra, to a similar exception in a charter party, as already alluded to. Larsen v. Sylvester, supra, must be interpreted as depending upon the form of the phrase, "of what kind soever," which is taken to mean any kind of cause at all, even at the expense of making nugatory the preceding language. While it must be owned that the distinction is somewhat verbal, it is hard to escape the result.

My conclusion is that both on principle and authority, so far as can be gathered from the books both here and in England, the delay of a ship caused by the insufficiency of berthing facilities is not comprised in such a clause as article 8. It is especially to be noted that this applies even when the charter party contains an exception against strikes and lockouts, which clearly contemplate economic disorders. Thorman v. Dowgate, supra, and Northfield S. S. Co. v. Compagnie, supra, were therefore much stronger cases for the charterer than the case at bar is for the owners here.

[6, 7] Being without excuse the ship's return was a deviation, and she is responsible for any results arising from that fact. The law regarding deviation does not seem to me very clear. On the one hand it is said in Thorley v. Orchis S. S. Co., [1907] 1 K. B. 660, that deviation is an abandonment of the enterprise, i. e., the agreed voyage, and the substitution of another, to which the bill of lading does not apply. Hence the ship cannot take advantage of any exceptions and is liable at least as common carrier, and perhaps as absolute insurer.

Judge Brown in Calderon v. Atlas S. S. Co. (D. C.) 64 Fed. 874, 877, 878, expressly distinguished between land and water carriage in this respect, holding that as to water carriage the loss need not be directly caused by the deviation, and that the carrier was an insurer. He did not, however, decide that the contract had been abandoned, because he enforced one term of it. He was reversed as to this in the Supreme Court, but not on the ground stated in Thorley v. Orchis, supra. He again declared obiter the same rule in The Bordentown (D. C.) 40 Fed. 682, 689.

Justice Story, in Trott v. Wood, Fed. Cas. No. 14190, held the ship liable for a loss by capture which was not the direct result of forwarding by another vessel, and Justice Grier did the same in the case of a shipwreck in Bazin v. S. S. Co., Fed. Cas. No. 1152. The ship was held to be an insurer, but the ratio decidendi was not given. Judge Betts, in Thatcher v. McCulloh, Fed. Cas. No. 13862, appears obiter to have thought that the loss must appear to be due to the deviation.

In The Citta di Messina (D. C.) 169 Fed. 472, 475, Judge Hough, obiter, went still further, saying that the shipper has an option to treat the deviation as a conversion, or to hold the ship for any loss subsequent to deviation regardless of its causal relation. It must be conceded that at least in the case of delays the same rule does not apply to land carriage. Railroad Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; St. Louis, etc., Ry. v. Com. Ins. Co., 139 U. S. 223, 237, 11 Sup. Ct.

554, 35 L. Ed. 154, and the general applicability of the land rule has the high support of Williston (Williston on Contracts, § 1096).

I must own that it seems to me open to question whether any deviation of however slight account, must be regarded as a total abandonment of the enterprise and the substitution of a new voyage, under the rule in Thorley v. Orchis, supra, followed in The Citta di Messina, supra, and I am much strengthened in this doubt by the opinion of Mr. Williston. That there may be such a deviation is of course, very clear, as, for example, if a ship bound from New York to London should proceed by way of Rio and Buenos Ayres. I see no reason in such a case for refusing to treat the voyage as totally abandoned, and the contract of carriage as no longer applicable. In the case at bar it is too clear for words that the return to New York was a total abandonment, even if the Acme Company intended to transport the goods again to Havana by another bottom, which indeed is far from true. Therefore, here it is not necessary to rule on the general question suggested.

[8] Even so, I do not understand that the exceptions do not protect the carrier for any breaches of the contract which occurred before deviation. In Thorley v. Orchis, supra, the damage was done at discharge. In Calderon v. Atlas S. S. Co., supra, it occurred after deviation. In the Citta di Messina, supra, the time of deviation was said to be the critical period. The ship's liability for any loss or injury to the cargo before November 25th was therefore limited by the exceptions, and it was only thereafter that she became an insurer.

[9, 10] The bill of lading contains exceptions against loss by thieves and by breakage. These exceptions are not in the words of the Harter Act (Comp. St. §§ 8029–8035), but no point is made that they are void for that reason, if construed with an implied limitation that due diligence was in fact used to stow, handle, load, and deliver. I shall therefore assume that they are valid, but that such limitations are implied. The burden is on the ship to prove that the losses fall within the exceptions so construed. As to thieving, the stevedores were employed by contractors engaged by the ship, and were not employees of the ship directly, and the exception is good if there was due diligence used to load. The exception of course does not apply to the discharge. As to breakage, the exception is good for all breakage before November 25th, if there was due diligence used to stow.

Upon these issues a great deal of testimony was taken and if I could make any useful decisions upon it now, perhaps I should do so, so as to guide the Commissioner, but I cannot. I am satisfied that the stowage was in large part negligent, but such a general finding is useless at this stage, because the stowage of each parcel of this mixed cargo may present a separate question, which cannot properly arise until the nature of the damage to that part is proved. Then only can the question of stowage become practically important.

[11] But there is another reason why at the present time I need not discuss the stowage, and this applies also to the loss either by thieving or by breakage. I have already held the ship absolutely after November 25th for both these losses. The libelants will make out a prima

facie case by showing their loss by shortage and breakage. In so far as in fact this happened after November 25th it will be a conclusive case; in so far as it happened before, the ship may be able to answer it. but has the burden of proof. To carry that burden, however, it must show that the loss or breakage is within some exception in the bill of lading. But no exceptions are good after November 25, 1920, and to bring the loss within the exceptions, the ship must therefore show that the thieving occurred at New York before the vessel sailed on October 3d, and that the breakage occurred before November 25th. It may well be that this will be impossible; if so, the ship will stand charged with the whole loss. For these reasons, I think it best to leave all these questions for the Commissioner, when the libelants begin to prove their losses, and to suggest to him that he need not make findings upon the issues of good stowage or care in watching unless the ship succeeds in showing what part of the loss happened before November 25th.

[12] The last question is of the parties liable. First, of the ship. The charter party did not provide that the master should sign the bills of lading; that clause in the printed form being struck out. By an addendum it provided that the Acme Company should issue no bill of lading until the freight had been paid to the Polish Company. Thus the charter party clearly contemplated bills of lading running in the name of the Acme Company, and they all so read. Most of them were in fact signed by the company, but a few by the master. So far as concerns the ship, it makes no difference. Being once laden she was bound for right delivery though the charterers sign. The Euripides (D. C.) 52 Fed. 161; The Centurion (D. C.) 57 Fed. 412; The Freda (D. C.) 266 Fed. 551. In The Esrom (No. 2) 272 Fed. 266 (C. C. A. 2d), February 24, 1921, it was agreed by all the judges that the charterer's bill of lading bound the ship for right delivery. Indeed, the cargo would have a "privilege" against the ship for right delivery, even without any bill of lading. The Saturnus, 250 Fed. 407, 162 C. C. A. 477, 3 A. L. R. 1187.

[13] Second, of the charterer. Clearly the Acme Company is liable for all bills of lading signed by it. It is liable besides on those signed by the master, since these were signed with its consent and in its name, and since it had no right to compel him to sign for the owners. Moreover, the venture was primarily theirs, and they were liable though the master signed bills of lading for the owners. Pendleton v. Benner Line, 246 U. S. 353, 355, 38 Sup. Ct. 330, 62 L. Ed. 770.

[14] Third, of the Polish Company. It was not liable under the bills of lading because these did not purport to bind it; they issued in the name of the charterer, which under the charter party was the only party bound to sign. The case is therefore not like Knutsford v. Tillmanns, supra, or The Themis (C. C. A. 2d), 275 Fed. 254, July, 1921, in which the charterer signed for the master under a charter party by the terms of which he could have compelled the master to sign. Even those bills of lading actually signed by the master were in the charterer's name, in doing which he acted as the charterer's, not the owner's servant. Ordinary principles of contract apply, and if the Polish Company is to be held it can only be as an undisclosed principal.

[15] The charter party, for reasons already given, prima facie precludes that possibility, and nothing in pais contradicts the conclusion. It is true that the Polish Company kept Jensen at the Acme offices carefully supervising the issuance of all bills of lading and taking all the checks. This, however, was in pursuance of its agreement with the Acme Company by which it was to have all the freight as security for the hire, not only of the Poznan, but of the Ida and the Krakow. It was natural not to trust to the credit of the Acme, and to take the freight direct by indorsement. Yet the venture remained that of the Acme Company, as is proved by the fact that all profits were in the end to come to it. The Polish Company is not liable in contract.

[16] However, the libelants insist that the Polish Company is liable in tort, which is said to rest upon compelling the Acme Company to break its contracts with the libelants at the time the ship was ordered home. The final order to the master to return came from Nevelson in New York, after he had exhausted all the efforts he thought desirable to find berths in Havana. No inducement or persuasion was directed to the Acme at all; the order ignored the charterer, though given with its assent, or at least without its dissent. Now it is well settled law in federal courts that where a third party procures an obligor to break a contract, he commits a tort against the obligee. Angle v. Chic., etc., Co., 151 U. S. 1, 14 Sup. Ct. 240, 38 L. Ed. 55; Bitterman v. Louisville, etc., R. R., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693. In short, the rule first laid down in Lumley v. Gye, 2 E. & B. 216, has been fully accepted, and is even extended beyond cases where the injured party has a contract. Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283; Hitchman Coal Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461. Under the facts at bar the Polish Company did commit a tort in directing the master to deviate and return to New York. Indeed it was they who primarily broke the contract, the Acme Company was nearly, if not quite, a silent and helpless dummy. I cannot see how the rule could be more aptly illustrated than in such a case.

[17] Was it, then, a maritime tort over which the admiralty will take jurisdiction? Confessedly, that question depends rather on historical than a priori considerations. Ordinarily it is the locus of the tort which governs, and where the injury is on the water though the defendant's act was on the land, that locus is determined by the water. Hermann v. Port Blakely Mill Co. (D. C.) 69 Fed. 646; Atlee v. Packet Co., 21 Wall. 389, 22 L. Ed. 619; The Normannia (D. C.) 62 Fed. 469, 472; Greenwood v. Westport (D. C.) 60 Fed. 560. Perhaps, not every tort committed at sea is within the jurisdiction of an admiralty court. Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 60, 61, 34 Sup. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157. At least for the purposes of this case I may assume that the injury must be maritime in its character as much as though the case sounded in contract. The injury here was the breach of the contract of carriage itself, the effective cause of which was the act of the Polish Company. Obviously if that contract was maritime enough in its character to base a

libel upon it in contract, the injury resulting from the wrongful act on shore was as maritime, because it was the same thing. The case is a far less stretch of jurisdiction than The Normannia, supra. I conclude therefore that the Polish Company is liable in tort for turning back the Poznan, and that this court has jurisdiction.

[18-20] The remaining question is the extent of this liability in tort. It is apparent that the damage for bad stowage is not attributable to the order to return. Similarly of the pilfering on the North River. The pilfering at Brooklyn was in fact a consequence of the order to return, but too remote to be its legal result. No one would reasonably have apprehended it. Perhaps the Polish Company had assumed charge of the cargo at Brooklyn; the situation is not very clear, for the Acme Company had certainly not abandoned the cargo. The respondents insist that the marshal was in charge, but, although he was in technical possession, this was not the case. However, it will probably be impossible in fact to decide which part of the loss by pilferage occurred at Brooklyn and which at the North River. As against the Polish Company the libelants will have the burden on this issue and probably cannot carry it. It appears better, therefore, not now to pass on the question whether the Polish Company is responsible for that loss owing to any relation it assumed to the cargo on its arrival. The Commissioner may pass on that if it becomes relevant.

[21] The responsibility in tort for the other damages requires some analysis into the situation on November 25, 1920. The Acme Company was bound to make right delivery at Havana; it had no excuse in the bills of lading. Similarly, the ship was bound to the cargo. But the Polish Company is liable only for the proximate consequences of its order to return. If the ship at that time could not have made right delivery at Havana or some other Cuban port, the order did not injure the shippers. Their relief can then rest only in contract. If on the other hand, the ship could have delivered, the consequence of the order is the shippers' loss in getting delivery at New York in December and January as against delivery at Havana when delivery could have been made after November 25, 1920. Now it is perfectly clear that the Poznan could have discharged at some time at Havana, though just when may be open to doubt. After January 1, 1921, when Col. Despaigne was appointed by the President to relieve the harbor, the wharves began to clear. Before January 20th he had "habilitated" many more warehouses, and by March 9, 1921, when Yero's testimony was taken, there were only two or more steamers still discharging, of which one was the Acme's ship (under charter), the Whitney. It follows that the Poznan could have been discharged some time during January or February at the latest, had she stayed in the harbor, as was her duty.

[22] It may be urged that no one could know on November 25th that any such relief would come, and that the loss resulting from the Polish Company's order was not therefore proximate. I agree that no one at that date could tell how long it might take to discharge the ship, but I do not agree that it was apparent that she could not be discharged at all. On the contrary, it was reasonably certain that she could be discharged, though that might take time. There was no con-

ceivable economy in returning to New York and reshipping. Such a course was sure to lose time. In directing the return the Polish Company became chargeable with the possibility of a berth's being offered in January or February or earlier. In the loss incurred by the ship's failure to wait they associated themselves. Now it may be argued that the Acme Company might and probably would have returned independently of any direction of the Polish Company. Perhaps that is so, but the objection does not lie in the respondent's mouth. They gave the order which turned back the ship, and they were therefore the authors of the wrong from which loss resulted. It is no answer that the Acme Company might later have committed an independent wrong which would have caused an equal loss.

[23] The proper rule of damages is a little different under the tort and under the contract. Under the contract, it is the difference in value of the goods at Havana delivered at a reasonable time after the Poznan arrived, and their value in New York when delivered. This may or may not correspond with the cost of carriage to Havana; there is no necessary relation between the two, and, as I said at the outset, the amount of the prepaid freight has nothing to do with it. This rule is established in the books. The Caledonia, 157 U. S. 124, 139, 15 Sup. Ct. 537, 39 L. Ed. 644; The Success, Fed. Cas. No. 13,586, 7 Blatchf. 551; The Giulio (D. C.) 34 Fed. 909; The City of Para (D. C.) 44 Fed. 689; The Coventina (D. C.) 52 Fed. 156; The Arctic Bird (D. C.) 109 Fed. 167, 175. What was a reasonable time for delivery depends upon when with reasonable efforts the Poznan could have discharged. In deciding it the commissioner may find it necessary to consider the various negotiations for wharves in Havana, which are immaterial to the controversy in chief. In any case this date cannot be later than March 1st. Perhaps the difference in value between November 1st and March 1st is not enough to require this investigation; it is to be greatly hoped that the parties may agree upon some date.

[24] Upon the tort the rule is different only to this extent, that the Polish Company is not responsible upon the basis of any possible discharge before it intervened on November 25th. The date depends upon when the Poznan could have first discharged after that day. That date must be fixed upon the assumption that the Acme Company was unaided in the unlivery. The Polish Company is not charged in personam with any affirmative obligation; the consequences of its tort are only the possible discharge which it actually prevented. This may seem inconsistent with my ruling that its liability does not depend upon whether the Acme would have discharged at all, but it is not. The inquiry as to damages is based, not upon what the Acme would have done, but upon what it could have done, had it performed as it was bound to do. Again, it is to be hoped that the parties can avoid a long investigation of a necessarily hypothetical character, on which it may well be that only small differences, in view of the amounts at stake, will depend. They may agree upon an average date of discharge.

The cause will be referred to Judge Lacombe as Special Commissioner, if he cares to take it up, as soon as the parties wish; otherwise to such other commissioner as the parties may agree upon.