YERAMEX INTERNATIONAL, Appellee,

v.

S. S. TENDO, S. S. LINDO, their
engines, etc., Defendants,

and

Reederei D. OLTMANN, K.
G., Appellant,

v.

PORTSMOUTH TERMINALS, INC., a
Virginia Corporation and Nacirema
Operating Co., Inc., Appellees.

YERAMEX INTERNATIONAL,
Appellant,

v.

S. S. TENDO, S. S. LINDO, their
engines, etc., Reederei D. Oltmann,
K. G., Appellees,

v.

PORTSMOUTH TERMINALS, INC., a
Virginia Corporation and Nacirema Op-
erating Company, Inc., Appellees.

Nos. 77–2603, 77–2604.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 1978.

Decided March 30, 1979.

M. E. DeOrchis, New York City (Brian D.
Starer, Nicholas H. Cobbs, Haight, Gardner,

Poor & Havens, New York City, Braden Vandeventer, Jr., and Walter B. Martin, Jr., Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellant in 77–2603 and for appellee in 77–2604.

Donald M. Kennedy, New York City (Donovan, Maloof, Walsh & Kennedy, New York City, R. Arthur Jett, Jr., Jett, Berkley, Furr & Price, Norfolk, Va., on brief), for Yeramex International.

John R. Crumpler, Jr., Norfolk, Va. (Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., on brief), for Nacirema Operating Co., Inc.

Walkley E. Johnson, Jr., Norfolk, Va. (Crenshaw, Ware & Johnson, Norfolk, Va., on brief), for Portsmouth Terminals, Inc., appellee in 77–2603 and 77–2604.

Before HAYNSWORTH, Chief Judge, and HALL and PHILLIPS, Circuit Judges.

K. K. HALL, Circuit Judge:

Reederei D. Oltmann, K.G., a foreign corporation, appeals a judgment entered against it *in personam* as owner of two container vessels on which damaged cloth goods were shipped to plaintiff, Yeramex International, under a bill of lading issued by the vessels' time charterer, Maritime Container Lines, Ltd. ("MCL"). MCL, through its agents, accepted and loaded the goods into sealed containers owned by MCL, failing to note on the bill of lading the damaged condition of their overland shipping cartons. The bill of lading was issued by MCL and signed "For the Master".

It is not contested that liability *in rem* would lie against the vessels carrying the damaged goods and that liability *in personam* would lie against MCL because it caused the bill of lading to be issued in its own name. *Gans S. S. Line v. Wilhelmsen (The Themis)*, 275 F. 254, 262 (2nd Cir.), *cert. denied*, 257 U.S. 655, 42 S.Ct. 97, 66 L.Ed. 419 (1921); *The Poznan*, 276 F. 418, 432 (S.D.N.Y.1921); *Demsey & Associates v. S.*

*S. Sea Star*, 461 F.2d 1009 (2nd Cir. 1972). But faced with both an unenforceable judgment against MCL[1] and its inability to bring the vessels into the *in rem* jurisdiction of the district court, Yeramex brought this action against Oltmann on the theory that, as owner of the carrying vessels, Oltmann could be liable *in personam* as a contracting party, or "carrier," under the Carriage of Goods by Sea Act, 46 U.S.C. § 1301 *et seq.* [hereinafter "COGSA"].

This presents us with a single dispositive issue: whether, as against a third party, the vessels' owner is liable *in personam* for the misdeeds of the vessels' time charterer by virtue of the authority of their captains or masters to sign bills of lading and to authorize the charterers to sign them "For the Master."

The district court reasoned that the masters acted solely as the owner's agents and their real authority over bills of lading created a chain of authority from the owner to the charterer sufficient to make the owner liable as a contracting party on the bill of lading.

We disagree with this assessment of the masters' authority because the terms of the vessels' time charters grant the masters dual authority to act separately as agents for the owner and as agents for the charterer in matters involving the separate responsibilities for ship, as assumed by the owner, and for cargo, as assumed by the charterer. Furthermore, we find no apparent authority to bind the owner to the bill of lading as a contracting party, because neither the handling of cargo nor the terms of the bill of lading could reasonably have misled shippers and other third parties to believe that such authority existed in fact. Therefore, we reverse.

## I. SOLICITATION AND HANDLING OF DAMAGED GOODS

The underlying facts as found by the district court are not in serious dispute re-

---

1. In 1976, Yeramex obtained a judgment against MCL in the United States District Court for the Southern District of New York, No. 75–Civ. 376, but its judgment is unenforceable because MCL is bankrupt. As here, jurisdiction over the vessels could not be obtained in that suit.

garding the solicitation and handling of the damaged goods carried by the owner's two vessels, the *S. S. Tendo* and the *S. S. Lindo*.

### A. Cargo Handling/Notice of Damage

The goods were damaged some time before their overland delivery to the Portsmouth Marine Terminal in Portsmouth, Virginia. The goods, in visibly damaged paper cartons, were stevedored by Nacirema Operating Company, Inc.[2] pursuant to its contract with MCL's local port agent, Hampton Roads Steamship Agency. Nacirema loaded the cartons into two containers owned by MCL for shipment to France on board the *Tendo*.

Nacirema sealed the containers and informed Hampton Roads that the cartons were damaged by noting on tally sheets "all bundles mashed, torn and bands broken." These tally sheets were drawn on printed forms provided by Portsmouth Terminals, Inc., the terminal operator,[3] and were carried to Hampton Roads by a runner for the terminal operator. The only notice of cargo which was sent to the ship's personnel was a dock receipt tally sheet showing the nature and weight of the cargo but not its condition. This notice was on MCL's printed form and contained no space for remarks about the condition of the cargo to be loaded and carried.

When Hampton Roads received the tally sheets prepared by Nacirema showing carton damage, it sent notice of the damage to MCL's agent in New York, Constellation Navigation, Inc. Ignoring Hampton Roads' notice of damage, Constellation issued a bill of lading which contained no exception for the damaged condition of the shipping cartons.

When the *Tendo* was ready to sail and before the goods were loaded on board, it was noticed that one of the containers was "bulging," and it was not put on the ship. The damaged cartons were reloaded into a stronger container by the stevedore Nacirema—but not in time to sail on the *Tendo*. This second container was shipped on the later sailing *Lindo*.

### B. Solicitation of Contract of Carriage/Bill of Lading

The bill of lading was issued on MCL's printed letterhead form and was signed by MCL's agent. It contains a space for the name of the carrying vessel but no space for disclosure of the vessel owner's name; the owner's name does not appear on the bill. The bill of lading identifies the *Tendo* as the carrying vessel and contains a clause permitting carriage of the cargo on vessels other than the one named. The printed caption, "For the Master," appears under the signature line.

On the back side of the form a clause captioned "Contracting Parties" states,

> [T]he contract evidenced by this [Bill of Lading] is between the Merchant and the Carrier, MCL, Ltd. and it is agreed that MCL, Ltd. only shall be liable as Carrier under this [bill of lading].

The bill of lading recites, as required by 46 U.S.C. § 1312, that COGSA governs its terms, and the whole of COGSA is incorporated by reference into the bill of lading—including the COGSA definition of the term, "carrier."

### II. COGSA

COGSA imposes *in personam* liability upon "carriers" of goods by sea. 46 U.S.C.

---

**2.** The defendant owner impleaded both Nacirema and Portsmouth Terminals, Inc., the terminal operator, as third party defendants, claiming that in the event it was held liable to plaintiff Yeramex, it should be entitled to judgment over against them. To support this theory of liability it claimed that third party defendants had failed to report the damaged condition of the goods directly to it or to the ships' personnel and that they had failed to recouper the goods before stuffing them into the containers. Plaintiff Yeramex then amended its complaint

to include claims against Nacirema and Portsmouth Terminals on the same ground.

The district court held these third party defendants were not liable to either defendant owner or plaintiff because the evidence showed that they had complied with instructions from MCL and with the customary practices of the port. Plaintiff has withdrawn its appeal from that holding. Thus, our decision in favor of defendant owner obviates any consideration of the issue.

**3.** See n.2.

§§ 1302–03. It applies only to contracts for the carriage of goods, that is, only to the transactions between parties who seek to ship goods and those who agree to carry them. *Id.* It expressly does not apply to the terms of vessel charters, which constitute the arrangements made by vessel owners and charterers for the carriage of goods—except as those arrangements may affect the statutory protection afforded shippers in their contracts of carriage. § 1305.

A "carrier" is defined as "the owner or the charterer who enters into a contract of carriage with a shipper." § 1301(a). Contracts of carriage include only those "covered by a bill of lading or any similar document of title . . . ." § 1301(b). "Carriage of goods" commences when the goods are "loaded on" and ends "when they are discharged from the ship." § 1301(e). COGSA imposes duties and liabilities upon contracting carriers both for the seaworthiness of the carrying vessels and for the loading, handling, stowing and discharge of goods carried. § 1303. Among these statutory duties is the requirement that "the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing . . [t]he apparent order and condition of the goods. . . ." § 1303(3).

■ This last duty, as all parties agree, was breached by MCL and its agents, and thus plaintiff has made out a *prima facie* case for *in personam* liability of MCL as carrier. § 1304. However, the defendant owner vigorously contends, and we think properly so, that plaintiff has failed to carry its preliminary burden of showing that the "carrier" of the damaged goods was the vessels' owner rather than the charterer in whose name the bill of lading was issued. Because plaintiff's theory of liability depends exclusively upon the import of the signature caption "For the Master," the actual and apparent authority of the master and MCL to issue bills of lading must be examined. *The Poznan*, 276 F. at 432; *United Nations Children's Fund v. S. S. Nordstern*, 251 F.Supp. 833, 838–39 (S.D.N.

Y.1965); *Tube Products of India v. S. S. Rio Grande*, 334 F.Supp. 1039, 1041–42 (S.D.N.Y.1971); *Thyssen Steel Corporation v. S. S. Adonis*, 364 F.Supp. 1332, 1335 (S.D.N.Y. 1973); Scrutton On Charter Parties, Art. 19 at 37–38 and Art. 37 at 66–69 (18th ed. 1974) [hereinafter "Scrutton"]; W. Poor, American Law of Charter Parties § 10 (5th ed. 1968.)

### III. TIME CHARTERS GENERALLY/DIVISION OF COGSA CARRIER'S DUTIES

■■ The duties and liabilities of owners and charterers as against each other are established by each vessel's charter. Under a time charter, the charterer and owner share duties for the carriage of goods for a specified time. The commercial objective of such a charter is to divide the duties for navigation and seaworthiness of the ship and for the handling of cargo among the owner and charterer, with the expectation that both will benefit from the vessel's earnings. In dividing the duties, the parties ultimately divide the liabilities for the loss of cargo and for notice of its condition when accepted for loading, all according to which party agreed to perform the duty that gives rise to the loss or to notice of that condition. Bauer, Responsibilities of Owner and Charterer to Third Parties—Consequences Under Time and Voyage Charters, 49 Tul.L.R. 995, 1004 (1975). *See Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 330–34 (2nd Cir. 1972). As explained by Judge Hough in *The Santona*, in a time charter context,

> The ship is the owner's ship, and the master and crew his servants for all details of navigation and care of the vessel; but for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charterers, the master and crew are the servants of the charterers.

*Clyde Commercial S. S., Ltd. v. United States Shipping Co. (The Santona)*, 152 F. 516, 518 (S.D.N.Y.1907). Given such an agreed division of responsibilities between the owner and charterer, the authority of

the master varies in each of his undertakings according to the interest of the party who assumed responsibility for his activity.

The master's traditional authority over cargo and bills of lading has changed significantly with changing modes of commerce.

The ordinary authority of a master has lessened very much in modern times. Modern methods of communication have enabled the owner to perform much of the master's work in foreign ports. The system of printed bills of lading and the extensive development of regular lines of vessels, with their accompanying agents and branches abroad, have converted the master into little more than the chief navigator of the ship. In the ports of loading and discharge he has commonly very little to do, and, though on the voyage the necessity of the case may confer on him considerable power, increased facilities of communication have much diminished the cases where, not being able to communicate with his owners, such necessity arises. The cases must therefore be read subject to the proviso that the position of the master has materially altered of late years; the master has been superseded partly by the owner and partly by the broker and the broker's or master's authority is usually strictly defined by the printed bill of lading. (Notations omitted)

Scrutton Art. 19 at 37.

The authority of the masters of the two container vessels which carried plaintiff's damaged goods comports with this general assessment of a modern-day master's authority for cargo and bills of lading.

### IV. AUTHORITY OF CHARTERER AND MASTER UNDER VESSELS' TIME CHARTERS

Both time charters at issue were drawn on standard New York Produce Exchange forms with numerous, similar interlineations. MCL chartered the *Tendo* from defendant Oltmann for 2 years and 1 month. MCL subchartered the *Lindo* from the original time charterer for eighteen months, with an option to continue another eighteen months. Each of the charters and MCL's subcharter provide,

That the Captain [Master] shall prosecute his voyage with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, discharge, tally, lash and unlash the cargo at their expense under the supervision of the Captain, who is to sign, or if requested by Charterers to authorize Charterers and/or their agents to sign Bills of Lading for cargo as presented in conformity with Mate's for Tally Clerk's receipts. See Clause 57.[4]

Clause 57 is an incorporated rider to the printed form and reads,

57. Charterers shall indemnify Owners from all consequences arising out of Master or agents signing Bills of Lading in accordance with Charterers' instructions, or from complying with any orders or directions of Charterers in connection therewith. Owners are not to be responsible for shortage, mixture, marks, number of pieces or packages, contents of containers, or damage to containers or their contents, except where occurring on board and without fault of Charterer or its agents. Charterers' stevedores are to load and discharge under the supervision of Master, who is solely responsible for trim and stability. Charterers to be responsible for securing all cargo within container, and for loss or damage to vessel, containers or cargo, if due to stowage or discharge in negligent fashion or contrary to terms of this Charter-Party.

Under these provisions, the owner is responsible for navigation and seaworthiness of the vessels; the charterer is responsible for all matters relating to cargo other than

---

4. In the time charter for the *Tendo*, this paragraph concluded with the words, "if mutually regarded necessary."

trim and stability and other matters affecting the vessels' seaworthiness. As between the owner and charterer, MCL is solely responsible for notice of visible damage to cargo when accepted for loading by MCL or its agents at port.

 The applicable charter provisions setting forth the masters' authority show that MCL assumed exclusive responsibility for handling of cargo and for issuance of bills of lading. In particular, we think all authority conferred by these provisions upon the vessels' masters for bills of lading issued by MCL was authority which flowed, in fact, from MCL as principal to the masters as its agents, rather than as authority granted to MCL from the masters as the traditional personal agents of the owner. Therefore, the district court's assessment of the masters' real authority was erroneous. No authority in fact existed for MCL to bind the owner to the terms of the bill of lading as a contracting party, and no liability *in personam* under COGSA will lie against the owner in favor of third parties unless plaintiff can show from the circumstances of solicitation and handling of cargo or the terms of the bill of lading that it was led to believe—erroneously but reasonably—that the owner was a party to the charterer's bill of lading which was issued "For the Master." *See The Poznan,* 276 F. at 432; Scrutton Art. 19 at 38; *Tube Products of India v. S. S. Rio Grande,* 334 F.Supp. at 1041–42.

We think MCL's dealings both with the ship's personnel and with third party shippers in solicitation of the contract of carriage, all as borne out in the clear terms of the bill of lading, show that MCL solicited carriage of the damaged goods in its own name, holding itself out for all purposes as the principal contracting party. The bill of lading was issued by MCL, not the master; its terms clearly define MCL as the principal contracting party and disclaim any personal liability of the owner as an undisclosed contracting party. Other than the signature caption "For the Master"—which standing alone has an ambiguous meaning in modern-day commerce—plaintiff points

to no fact which could reasonably lead parties relying on the terms of the charterer's bill of lading to believe that it was issued on the owner's behalf as a COGSA carrier. Therefore, no liability *in personam* can lie against the owner for MCL's bill of lading.

## V.

Our decision in favor of the defendant owner obviates consideration of other issues raised by this appeal. Therefore, the judgment against defendant Oltmann in favor of plaintiff Yeramex is

*REVERSED.*