THE LANGFOND.

(District Court, S. D. New York.   January 2, 1906.)

SHIPPING—DAMAGE TO CARGO—PERILS OF THE SEA.

A quantity of arsenic was stowed in the same hold with olive oil, but where the slant of the deck was downward from the arsenic toward the oil, and with a dunnage of about four inches.   It was shown that the method of stowing the arsenic was usual, and that there was apparently no danger to it under ordinary circumstances.   It was also shown that the voyage across the Atlantic was very rough, and that the vessel rolled and pitched to an unusual extent, and when she arrived at New York some of the arsenic was found to have been injured from leakage of the oil.   *Held*, that under such evidence the damage must be attributed to perils of the sea, for which the vessel was not liable.

[Ed. Note.—Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118].

In Admiralty.   Action for damage to cargo.

MacFarland, Taylor & Costello, for libellant.
Hunt, Hill & Betts, for claimant.

ADAMS, District Judge.   This action was brought by the Binney and Smith Company to recover the damages it sustained through contact between a part of 414 kegs of arsenic and some unrefined olive oil stowed in the same hold of the steamer Langfond, on a voyage between Barcelona, and other ports in Spain, and New York.   The bill of lading, dated the 11th day of May, 1904, acknowledges the receipt of the arsenic in apparent good order and condition.   The vessel sailed from Lisbon on the 29th of May and reached New York on the 13th day of June.   Upon discharging cargo, it was found that 86 kegs of arsenic were saturated with or injured by the olive oil.   The libellant alleges bad stowage in placing the arsenic and oil in the same compartment, that is, in holds 3 and 4 of the vessel, these holds not being separated by a partition or otherwise and practically but one compartment.   The claimant alleges that the goods were properly stowed and dunnaged and that the damage happened through perils of the seas, storms and stress of weather of unusual severity.

It appears that the arsenic was stowed in the after part of No. 4 hold with a dunnage of about 4 inches, which is regarded as ample for all usual contingencies.   There was a slant in the deck forward, so that a part of the floor of No. 3 was several inches lower than a part of the floor of No. 4.   The oil which leaked was stowed in No. 3 hold and naturally ran forward, except in heavy weather, when the steamer was being thrown about.

The testimony clearly shows that the method of stowing the arsenic was usual and there was apparently no danger to it under ordinary circumstances.   At the end of the voyage, what oil there was on the floor—and some remained because of its being clogged with coal dust and other dirt, rendering it too thick to pass off through the bilges—was lower than the lowest part of the arsenic.

The method of stowing is not severely criticised, but the place

selected is. The great preponderance of the testimony shows, however, that the place was a usual one and it appears that the master was limited in his choice of places as a large part of the vessel was designed for the transportation of edible goods and it would be obviously improper to stow a poison of this character in their close vicinity. Moreover, the arsenic was taken in at the first loading port when it was necessary to secure a full immersion of the propeller by cargo of a weighty character. The oil and olives in brine had to be kept near the pumps amidships, on account of their known liability to leak. A situation almost immediately over the propeller was therefore selected for the arsenic and the goods subsequently received arranged to supply the other places, having in view the dangerous character of the arsenic, as well as the necessity for keeping it dry. It would not have been exposed to any danger, if the voyage had been of a usual character. It was not, however, of such character but the weather was of great severity. It appears that the vessel rolled and pitched in an extraordinary manner. The master said he remembered the trip particularly on account of the heavy rolling of the ship. He further said:

"A. Well, on the 3rd day of June the sea was driving heavily and rolling; we put up the sails, easing out. It was fresh enough until 8 P. M. on the 4th, it was a regular storm with rain and the sails were made fast and the ship is (was) working heavily; the sea was swelling and raising up from the westward and the ship diving heavily; continual storms with rain, still diving and the sea both from W., W. S. W., and N. W. till 4 P. M. The 5th the storm was taken off, but still the sea kept on with heavy rolling.

"Q. * * * On the 6th at midday it was a little dull; but in the afternoon it raised up again to the storm with rain; the whistle was in continual use; it kept on continually until the 7th when the sea started from the N. and wind from the N. N. E.; kept on with high sea, shipping some spray and water.

*          *          *          *          *          *          *

"On the 7th in the afternoon the sea was taking off and the air was getting lighter and midnight became calm and we made fast the sails; after midnight it (was) breezing up again from S. E., which was raising a moderate gale with squalls. It kept on in the afternoon of the 8th; the ship was rolling heavily; wind veering round S., S. W., W.; hour by hour it was coming round till N. N. W. and N., and raising up a heavy sea. We set the sails, preventing rolling from the northerly sea. At 5 P. M. on the 9th one sail, the schooner sail, was split, and the gaff broken, from the heavy rolling of the ship. Midnight or the morning of the 10th, the sea and wind takes off and keep on larboard breeze until reaching Nantucket Shore Light Ship. While off the Light Ship, in sounding the holds there was shown oil in the pumps in Nos. 1 and 3 or in No. 3 and 4.

*          *          *          *          *          *          *

"A. In that time of year it is the worst kind I had ever had experience of; what more I cannot tell.

"Q. What can you say as to whether such weather as you encountered was sufficient to have thrown the oil casks out of stowage if they were properly stowed? A. Well, the rolling of the ship was sometimes so heavy that we had a hard job to keep ourselves fast with the general cargo, which proves how the rolling of the ship made the sails split and the gaff come down, which proves that the general cargo or any cargo can shift in the holds even if stowed in the very best manner whatever possible.

*          *          *          *          *          *          *

"Q. Well, how did the oil get on the arsenic? A. By the ship lifting up at the bow and it ran back and forth, that is what I think. * * *

Cross examination:

"Q. How old was this sail that split? A. I could not tell.

"Q. As old as the steamer? A. No.

"Q. Steamer sails get pretty old, don't they? A. It was a new sail, I think, but not quite. It passed through the sail-makers at home the year before.

"Q. Has this vessel bilge keels? A. Yes.

"Q. Nothing was carried away from the ship? A. Not except the gaff.

"Q. Nothing else? A. No.

"Q. What was the trouble with the gaff? A. It broke in the middle from the strain of the sail that was smashing.

"Q. What sort of gaff was it? A. Pitch pine gaff.

"Q. Did you examine it after it was broken? A. Yes.

"Q. Was there a knot there? A. There was a little piece of dark wood in it.

"Q. It was an imperfect stick? A. Yes."

This testimony was corroborated by the chief officer who made entries in the log to the same effect and said the oil could not be better stowed; that he caused the bilges to be cleaned out before sailing; that the rolling of the ship would move anything no matter how well stowed.

While due allowance must be made for the natural tendency to exaggeration on the part of these officers, there seems to be no way of accounting for the damage to the arsenic except by crediting their accounts to the extent of establishing a peril of the seas. It was shown that 9 of the barrels of oil were broken, which had the effect of freeing a much larger quantity of the contents than usual and was doubtless the cause of the damage here.

The libel will be dismissed.