## THE EMPRESS OF FRANCE.

### DUBLE v. CANADIAN PACIFIC S. S. CO., Limited.

District Court, E. D. New York.
Jan. 27, 1930.

Harry D. Thirkield, of New York City, for libelant.

Hardin, Hess, Eder & Freschi, of New York City (H. B. Elgar, of New York City, of counsel), for respondent.

INCH, District Judge.

Libelant was a passenger on the steamship Empress of France owned and operated by the respondent, Canadian Pacific Railway Company. His trunk was placed in the trunk room of the steamship which room was forward, on F deck, and was entered through No. 3 hatch. This hatch had its top exit at C deck, forward of the main house.

When the ship left Southampton, west bound, January 26, 1926, the top of this hatch was covered by a hatch cover, with the usual strongbacks, and this in turn was covered by a canvas, held in place by bars and wedges.

After the ship had been out from port several days and in the early morning of Sunday, January 31, 1926, this baggage room, in which was libelant's trunk, was flooded by sea water, which had come aboard and the trunk and its contents damaged.

■ There is no question here, it seems to me, but that libelant is entitled to recover for his loss unless it has been satisfactorily and clearly shown by respondent that this sea water damage was occasioned by a cause over which respondents and those in charge of the ship had not the slightest control and against which no human foresight could have prevailed.

In other words, that what happened was unavoidable by skilled navigation.

■ Accordingly, respondents claim and have offered testimony to show that this sudden flooding of the trunk room was directly caused by an unexpected and extraordinarily large wave which boarded the ship doing great damage. That this was an "act of God" as understood in admiralty. I believe this is so.

"By 'act of God' is meant some inevitable accident which cannot be prevented by human care, skill, or foresight, but results from natural causes, such as lightning, tempests, floods, and inundations." Words and Phrases, First Series, vol. 1, pages 118, 119 (and cases cited); Gans S. S. Line v. Wilhelmsen (C. C. A.) 275 F. 254–261.

It would thus be insufficient for respondent to rely on merely force of rough seas and high waves which were apparently to be encountered from almost the time the ship left port. The Rosalia (C. C. A.) 264 F. 285.

Nor would this defense avail if the negligence of those in charge of the ship contributed to bring about the damage. The Angelo Toso (D. C.) 278 F. 212.

Believing as I do that the respondents are not liable under the peculiar circumstances of this case, it is unnecessary to go into the question of the passage ticket and its terms.

There is no proof here that those in charge of the ship were negligent, or that the place where the trunk was stored was unsafe or liable to become unsafe. Pearce v. Thomas Newton (D. C.) 41 F. 106; The Zealandia

(D. C.) 48 F. 697; The Langfond (D. C.) 143 F. 150; The Del Norte (D. C.) 234 F. 667.

What occurred, as shown by the proof, is within the definition stated in the case of The Maumee (D. C.) 260 F. 862.

The libelant contented himself with offering in evidence the cross-examination of Brown, a witness examined de bene esse by respondent, and the testimony of Buskwood also so taken by the respondents. He thereupon rested.

The respondent then offered in evidence the direct and redirect examination of Brown, the direct examination of Buskwood, it being agreed that none of these witnesses was available for the trial, and then placed upon the witness stand one Dunfinger, supervisor of a shipyard at Hoboken, to which yard the steamship had been taken for repairs, immediately upon completion of her trip, to wit, February 4, 1926. The above completed the proof of both parties to this controversy.

It is unnecessary to state in detail this testimony. Brown was the baggage master of the steamship, at the time, and described the baggage room and what took place in connection with libelant's trunk together with other baggage both before and after the flooding of the room. His testimony shows that "there was approximately 80 to 100 tons of water in the baggage room" after this wave hit the steamship, and the result, in injury to the baggage in that room, can be imagined.

On his cross-examination, which is relied on by libelant, I find nothing to contradict the fair inferences to be drawn from his other testimony as to the description of the locality and what he found. "He was asleep at the time, which was about 1:15 in the morning," but immediately "got up and at 1:30 was in the baggage room. He remained up the rest of the night."

Nor do the statements of Buskwood contradict a finding that the great damage done to the ship, and incidentally this flooding of the baggage room, was caused by a sudden gigantic wave of great force and power, which had descended upon the ship, carrying away rails, twisting steel plats, wrenching cargo booms out of shape, carrying away 10 ventilators on C deck, breaking all the Laycock windows, which were on the promenade deck in steel frames, and actually "setting down" the C deck, an inch and one-half. This deck is approximately 25 or 30 feet from the water and was a wooden deck, consisting of a metal deck covered by 3½-inch planking, besides doing other damage.

This is confirmed by what Dunfinger found at the shipyard. It is a fair inference, in view of the short time that had then elapsed and the circumstances shown, that the result so found by him had been occasioned by such a wave, and that "both this wooden and steel deck and the beams of the ship were set down an inch and one-half." "That the ship had a sag in that particular section."

Buskwood, the chief officer of the ship, testifies that he was talking to another officer at the time and "I thought the ship had broken in two" when this wave hit the vessel. He hurried to the deck and saw that "No. 3 hatch is gone." This left a clear entrance for the sea water to pour into the trunk room, which it did.

This huge and entirely unexpected wave had, thus torn off the exit coverings to the hatch, flooded the baggage room, and sufficiently and directly accounts for the presence in that room of the enormous amount of water and the damage found there as already has been indicated by the baggage master Brown.

I therefore conclude that the libel should be dismissed.