**FERROMONTAN, INC.,** La Industrial Siderugica, Inc. and Caribe Steel & Tube Corporation, Plaintiffs,

v.

**GEORGETOWN STEEL CORPORATION,** Raw Materials Corporation, Allied Towing Corporation, Tug Heron, her engines, boilers, etc., Argonaut Insurance Company, Defendants.

**GEORGETOWN STEEL CORPORATION,** and Raw Materials Corporation, Plaintiffs,

v.

**RYAN-WALSH STEVEDORING COMPANY, INC.,** Third-Party Defendant.

Civ. A. No. 77-0324-1.

United States District Court,
D. South Carolina,
Charleston Division.

March 31, 1982.

N. L. Barnwell, Charleston, S.C., and Robert J. Ryniker, New York City, for plaintiffs.

Albert H. Parnell and Lane Young, Atlanta, Ga., Phillip H. Davey, Norfolk, Va., and Arthur M. Flowers, Jr., Georgetown, S.C., for Georgetown Steel Corp. and Raw Materials Corp., defendants and third-party plaintiffs.

Morton H. Clark, Norfolk, Va., and William H. Vaughan, Jr., Charleston, S.C., for Allied Towing Corp. and Tug Heron, etc., defendants.

Charles H. Gibbs, Charleston, S.C., for Argonaut Ins. Co., defendant.

Gordon D. Schreck, Charleston, S.C., for Ryan-Walsh Stevedoring Co., Inc., Third-Party defendants.

## ORDER

HAWKINS, District Judge.

### PRELIMINARY STATEMENT

This case involves a subrogated claim by the German underwriter (Gerling-Konzern), suing in the name of its insured, to recover monies paid out for the value of steel products lost on an ocean voyage from Georgetown, South Carolina, to San Juan, Puerto Rico. The cargo was lost at sea on October 6, 1974, when the barge carrying the cargo, the RMC 100, owned by the defendant Raw Materials Corporation and under charter to the defendant Georgetown Steel Corporation, while under tow by the Tug HERON, owned by the defendant Allied Towing Corporation, sank in the Atlantic Ocean off the coast of Florida.

The cargo in question, consisting of steel billets and steel wire in coils, had been manufactured by the defendant Georgetown Steel Corporation, who in turn had contracted for the sale of the steel to Otto Wolff Handelsgesellschaft M.b.H., a German-based international trading company dealing in steel and metals. Pursuant to the "C and F free out" terms of the sale, Georgetown Steel Corporation was responsible for transporting and delivering the cargo to the plaintiff Ferromontan, a wholly-owned subsidiary of Otto Wolff in San Juan, and which acted as sales agent for the ultimate sales to Puerto Rican customers. In order to accomplish that delivery, Georgetown Steel Corporation contracted with Allied Towing Corporation to have the Tug HERON tow the barge RMC 100 to San Juan. Ryan-Walsh Stevedoring Company, Inc., a contract stevedore, was employed by Georgetown Steel Corporation to load the steel products in the RMC 100 for the voyage.

The Tug HERON, with the RMC 100 and its cargo of steel in tow, departed Georgetown, South Carolina, on Monday, September 30, 1974, at 0525 hours, destined for San Juan, a voyage which under normal circumstances would have taken eight or nine days. However, some three days out of Georgetown, they began to encounter bad

weather, necessitating a reduction of speed and course changes. The weather continued to worsen until finally, at 0900 on the morning of October 6, after being advised by his Chief Engineer that they had insufficient fuel to complete the voyage to San Juan, the tug's Master, Captain William Hudgins, made the decision to abort the voyage and to head for the port of Cape Kennedy on the east coast of Florida. This decision necessitated a right-angle turn of the tug and tow to starboard and at 0915, within moments after the tug completed the turn, the tug personnel felt "a single sudden surge"; and, upon looking back toward the tow, the tug's captain saw that the RMC 100, which had previously been riding in a normal fashion, had disappeared. Fearing that his tug might be pulled under by the weight of the sinking barge, the captain ordered the crew to cut the towing cable with a cutting torch, and the HERON thereafter proceeded safely to Cape Kennedy, Florida. The barge and her cargo were never recovered.

As a result of the loss of the cargo of steel, the plaintiffs instituted suit initially in the District of Puerto Rico against Georgetown Steel Corporation, Raw Materials Corporation, Allied Towing Corporation, the Tug HERON, and the various liability underwriters of those defendants, alleging that the cargo was delivered to defendants in good order and condition for carriage to San Juan and that it was lost as a result of the negligence of and fault of the defendants in the care and custody of the goods. The defendants deny any negligence or fault and contend that the loss of the barge was due to an Act of God or peril of the sea, or an error in navigation or management of the vessels for which they would not be liable under law. They also contend that the plaintiffs are not the real parties in interest and that, in any event, they are estopped from recovery because of an agreement to insure Georgetown Steel Corporation against the liabilities asserted here.

Subsequent to the institution of the suit in Puerto Rico, the venue was changed to this district for the convenience of the witnesses, and the defendants Georgetown Steel Corporation and Raw Materials Corporation thereafter impleaded Ryan-Walsh Stevedoring Company, Inc. as a third-party defendant. Georgetown Steel Corporation and Raw Materials Corporation seek indemnity from Ryan-Walsh Stevedoring Company, Inc. for any judgment against them on the ground that Ryan-Walsh Stevedoring Company, Inc. negligently loaded the steel, thereby breaching its implied warranty of workmanlike performance. Ryan-Walsh insists that it loaded the cargo of steel in the RMC 100 in a competent and careful manner, in accordance with accepted stevedoring practices, and in accordance with the instructions received from Georgetown Steel Corporation and the captain of the tug.

In addition, Allied Towing Corporation had cross-claimed against Georgetown Steel Corporation for indemnification from any judgment obtained against Allied and for costs and attorney's fees; and Georgetown Steel crossclaimed against Argonaut Insurance Company for any sums within Argonaut's policy limitations for which the court might rule Georgetown Steel had liability and for attorney's fees for failure to defend, for statutory penalties, and for attorney's fees.

The issues being thusly joined, the case was tried before me without a jury commencing April 29, 1980. Having heard the testimony of the various witnesses, both live and by deposition, and having considered the evidence presented, I make the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Otto Wolff Handelsgesellschaft M.b.H. (hereinafter Otto Wolff) is a West German corporation with its principal place of business at Koln, West Germany. It acts as a factor and broker in the purchase and sale of steel products. It is the parent of plaintiff, Ferromontan, Inc.

2. Plaintiff Ferromontan, Inc. (hereinafter Ferromontan) is a Puerto Rican corporation with its principal place of business in San Juan, Puerto Rico. It is a wholly owned subsidiary of Otto Wolff for whom it acts as sales agent on steel transactions in Puerto Rico and the Virgin Islands. Ferromontan is a commission agent engaged in the purchase, sale, and importation of steel products into Puerto Rico on behalf of Otto Wolff as principal.

3. Gerling-Konzern Allgemeine Versicherungs Aktiengesellschaft (hereinafter Gerling-Konzern) is a West German corporation engaged in the business of insurance. Otto Wolff insured the cargo of steel which is the subject of this action with Gerling-Konzern under some form of open cargo policy. Gerling-Konzern issued its Certificate of Insurance No. 21–1612/9385 dated September 28, 1974, and has paid losses under the policy to Otto Wolff, Ferromontan, La Industrial Siderugica, Inc. and Caribe Steel & Tube Corporation.

4. Plaintiff La Industrial Siderugica, Inc. (hereinafter La Industrial) is a Puerto Rican corporation with its principal offices at Bayamon, Puerto Rico. It is engaged in the business of purchase, fabrication, and sale of steel products in Puerto Rico. La Industrial contracted with Ferromontan to purchase some of the steel which is the subject matter of this suit.

5. Plaintiff Caribe Steel & Tube Corporation (hereinafter Caribe Steel) is a Puerto Rican corporation with its principal place of business at Catano, Puerto Rico. It is the successor to Phelps Dodge Steel Co., Inc., under which name it was operating in February 1974. It is engaged in the business of purchase, fabrication, and sale of steel products in Puerto Rico. In February 1974, Phelps Dodge Steel Co., Inc. contracted with Ferromontan to purchase some of the steel which is the subject matter of this suit.

6. Defendant Georgetown Steel Corporation (hereinafter Georgetown Steel) is a South Carolina corporation with its principal place of business at Georgetown, South Carolina. It is a manufacturer, seller, and shipper of steel products to various customers including Otto Wolff and Ferromontan.

7. Defendant Raw Materials Corporation (hereinafter Raw Materials) is a South Carolina corporation with its principal place of business in Charleston, South Carolina. It is the owner of the Barge RMC 100 which it purchased from Allied Towing Corporation in November 1973 and bareboat chartered to Georgetown Steel.

8. Defendant Argonaut Insurance Company (hereinafter Argonaut) is an insurance company having offices in Atlanta, Georgia, and licensed to do business in South Carolina. Argonaut issued its comprehensive general liability policy, Policy No. CL–70–306–004751, covering Georgetown Steel, which was in effect on October 6, 1974. The policy provides $100,000.00 single-occurrence property liability coverage. Excluded from coverage is property in the care, custody and control of the insured or as to which the insured is for any purpose exercising physical control. Endorsement 3 to the Argonaut policy extended coverage to include losses occurring outside of the United States, its territories or possessions of Canada except "[t]o that portion of any loss with respect to which the insured has, or but for this existence of this policy would have, any other valid collectible insurance, whether such other insurance is on a primary, excess or contingent basis." (E.g., escape clause.)

Georgetown Steel carried an excess or umbrella liability policy with Harbor Insurance Company, No. 108886. The policy limits are $5 million. Constituting part of the policy is a "Schedule of Underlying Policies," which refers to the Argonaut policy.

9. Defendant Allied Towing Corporation (hereinafter Allied Towing) is a Delaware corporation with its principal place of business in Norfolk, Virginia. It is the owner and operator of the Tug HERON. Allied Towing contracted to use the Tug HERON to tow the Barge RMC 100.

10. Georgetown Steel did not own its own barges, but rather chartered barges for use in carrying its products. Allied Towing

had frequently supplied its barges to Georgetown Steel for the carriage of the steel, and, in fact, the RMC 100 was formerly owned by Allied Towing and known as the ATC 3000 before it was purchased by Raw Materials and chartered to Georgetown Steel.

11. Third-party defendant Ryan-Walsh Stevedoring Company, Inc., formerly Ryan Stevedoring Company, Inc. at Georgetown (hereinafter Ryan-Walsh), is an Alabama corporation with principal offices at Mobile, Alabama, and offices at Georgetown, South Carolina. Ryan-Walsh contracted with Georgetown Steel to stevedore steel cargoes into vessels at South Carolina Ports Authority Piers 31 and 32, Georgetown, South Carolina.

12. Ferromontan, as agent for Otto Wolff, began to deal with Georgetown Steel in either late 1970 or early 1971, ordering steel from Georgetown Steel for delivery in Puerto Rico.

13. Ferromontan ordered the steel which is the subject of this action from Georgetown Steel, on behalf of Otto Wolff, for resale to plaintiffs La Industrial and Caribe Steel.

14. Under the original orders for the shipment of steel, the invoices were designated C.I.F. shipments, and Georgetown Steel purchased cargo insurance covering the cargo being shipped for its interest and the interests of Otto Wolff/Ferromontan.

15. Wolfgang Jansen, then President of Georgetown Steel, and Helmut Dietze, then President of Ferromontan, held a close business and personal relationship dating from the mid-60's in Africa when both were employees of Otto Wolff.

16. From 1970 through October 1974, negotiations between Otto Wolff/Ferromontan (Helmut Dietze) and Georgetown Steel (Wolfgang Jansen) were usually verbal, face-to-face, and very informal.

17. Prior to October 1974, Helmut Dietze and Wolfgang Jansen met in Puerto Rico and, among other things, discussed the insurance arrangements for the steel shipments.

18. During the course of the discussions, it became obvious that Otto Wolff/Ferromontan could obtain the same insurance coverages, which Georgetown Steel had been providing, at a cheaper rate in the German market than Georgetown Steel could obtain on the American market.

19. Otto Wolff/Ferromontan had a close, long-existing relationship with the Gerling-Konzern, which included some common officers and/or directors. Otto Wolff, individually, was a member of Gerling-Konzern's Board of Directors.

20. Otto Wolff had a close insurance relationship with Gerling-Konzern and placed substantial coverage through the carrier.

21. As a part of the negotiations with Georgetown Steel on behalf of Otto Wolff, Helmut Dietze requested that Otto Wolff be allowed to place the coverages at that time being placed by Georgetown Steel, giving two reasons: (a) the closeness of the relationship, and (b) its ability to exercise leverage over Gerling-Konzern in the event of loss.

22. Otto Wolff/Ferromontan, by and through Helmut Dietze, and Georgetown Steel, by and through Wolfgang Jansen, entered into a contract and course of dealing whereby Georgetown Steel would ship steel C & F to the letter of credit order of Otto Wolff and would charge the purchase cost of the steel, less, among other terms, a discount of .75% for insurance with which Otto Wolff/Ferromontan was to have purchased insurance coverages for the same risks which Georgetown Steel had been purchasing until that time.

23. The change in insurance procedure agreed upon between Otto Wolff/Ferromontan and Georgetown Steel was mutually beneficial to both corporations in that they became more competitive in the Puerto Rican marketplace; and Otto Wolff/Ferromontan, in addition to sharing the increased marketability, also (a) moved closer to Gerling-Konzern, and (b) earned the difference if it could provide insurance for less than .75%.

24. At the time of the contract to insure referred to in paragraph 21 above, Georgetown Steel was purchasing cargo coverage naming Otto Wolff/Ferromontan as additional insured, as well as other specific coverages.

25. As of the date of the contract to insure referred to in paragraph 21 above, and thereafter through the date of the shipment in question, Otto Wolff/Ferromontan purchased cargo insurance, but it did not provide insurance naming Georgetown Steel as an additional insured or provide insurance covering the risks which Georgetown Steel had been purchasing.

26. Subsequent to this loss, Otto Wolff/Ferromontan and Georgetown Steel agreed to and did return to the original course of dealing wherein Georgetown Steel purchased the insurance to cover its interest and those of Otto Wolff/Ferromontan.

27. The Tug HERON is a steel hulled towing vessel, eighty-eight feet, nine inches (88'9") long and under 200 gross registered tons, owned and operated by Allied Towing Corporation. She is powered by a 1200 GM diesel electric engine driving one propeller. For the voyage in question, the Tug HERON was manned by Captain Kenneth H. Hudgins, two mates, two engineers, two deckhands and a cook.

28. The Barge RMC 100 (ex ATC 3000 and CAPE MAYETTA) was built at Todd Shipyard in Houston, Texas, as Hull # 582, in 1964. She was acquired in 1971 by Allied Towing and modified for ocean service. The modifications were designed by Adin K. Woodward, naval architect, and carried out by Norfolk Shipbuilding and Drydock Company. The modifications were approved by the United States Coast Guard and the American Bureau of Shipping. Upon completion of the modifications, the barge was "classed" with A.B.S. as A–1 Barge, for ocean service, assigned an International Loadline, and became a U.S. Coast Guard inspected vessel, certified for ocean service. As such, she was subject to annual inspection for classification and loadline by the ABS and biennial and mid-period inspections by the USCG. From the time of

her modification until the time of her sinking she met and passed all ABS and USCG inspection requirements.

29. The Barge RMC 100 was 200 feet long, with a forty-foot beam and a molded depth of seventeen feet, nine inches (17'9"). She was a hopper-type dry cargo barge with a 2545 long ton cargo capacity when loaded to her loadline. Her loadline in salt water lay at the fourteen foot, eight inch (14'8") mean draft, with a freeboard of three feet, one and three/quarter inches (3'1¾"). The cargo hopper was 156' long, 31' wide at the bottom, and 20'6" deep from the top of the coaming. The barge was equipped with overlapping steel pontoon hatch covers. The barge had double bottoms and void compartments fore and aft. The bow was raked and the stern was square.

30. Prior to the casualty voyage, Captain Hudgins, an employee of Allied Towing, joined the Tug HERON at Brunswick, Georgia, and towed the Barge RMC 100 with a cargo of log pilings to San Juan, returning to Georgetown, South Carolina, with the light barge. Despite rough weather enroute to San Juan that required him to hold his flotilla north of the Bahamas, that trip was completed uneventfully.

31. The flotilla arrived at Georgetown on September 27, 1974. The Tug SUGAR DADDY relieved the Tug HERON of the Barge RMC 100 and took it to the loading dock, while Tug HERON went to the Exxon Dock to refuel.

32. On September 27, 1974, Barge RMC 100 lay alongside Pier 32 at Georgetown, South Carolina, for loading.

33. Georgetown Steel contracted with Ryan-Walsh, a reputable concern with offices in Georgetown, South Carolina, to stevedore steel cargoes which it might ship by vessels, including barges, across South Carolina Ports Authority Pier 32 at Georgetown, South Carolina. The contractual relationship between Georgetown Steel and Ryan-Walsh was such that stevedoring rates for different types of cargoes and vessels would be negotiated from time to

time and those agreed-upon rates would be reduced to writing, normally by an exchange of confirming letters. There was no formal stevedoring contract as such. Ryan-Walsh loaded the Barge RMC 100 at Pier 32 during September 27–29, 1974, under the supervision of its General Manager, John E. Dyer, and Pier Superintendents, J. W. Scott, W. R. Turbeville and John Bullard. The loading operation was under the exclusive control of Ryan-Walsh.

34. Two distinct types of steel product were loaded aboard the Barge RMC 100: billets and coils. Steel billets are a solid bar measuring 4″ × 4″ (4×4) and 46′ long. Each billet weighs approximately one long ton (L/T). Coils are 8mm. wire rods bound with signod straps into coils approximately four feet in diameter and six feet long with a hollow core. Two coils are bound together, end to end, again with signod strapping, making a unitized draft or "master" coil weighing approximately two long tons. Upon completion, the Barge RMC 100 was loaded with 1803 billets of 1875 long tons and 604 coils of 592 long tons, for a total cargo tonnage of 2467 long tons.

35. Loading began during mid-morning, September 27, and continued around the clock until early afternoon, September 28, 1974.

36. Proper stevedoring practice requires distributing steel cargo evenly over the length of the barge.

37. Although both Georgetown Steel and Allied Towing denied giving any directions, instructions, or supervision to Ryan-Walsh in the manner or method of loading, there was evidence, and I so find, that Georgetown Steel had directed Ryan-Walsh to use wooden "spacers" to separate the bundles or drafts of billets loaded in the barges so as to facilitate discharge by its customers. In addition, Captain Hudgins instructed Ryan-Walsh that he wanted the weight of the cargo distributed in such a fashion as to leave the barge with a one-foot "drag" at the stern, i.e., one foot deeper aft than forward. The evidence further supported, and I so find, that it was Georgetown Steel who determined the quantity of cargo to be loaded on the barges chartered by them, including the RMC 100.

From the testimony of the Ryan-Walsh stevedoring superintendents who supervised the loading of the cargo (Bullard, Turbeville and Scott), I find that the procedure utilized by Ryan-Walsh for the loading of the RMC 100 and, for that matter, the other barges which had been loaded by Ryan-Walsh both prior to and subsequent to this ill-fated voyage, was as follows: Georgetown Steel would transport to its marine dock (designated by the South Carolina State Ports Authority as Pier 32) the quantity of coils and billets to be loaded; the billets would be brought on flatbed trucks, normally being separated with lumber "dunnage" (pieces of wood used to separate cargo) to facilitate lifting; a shore-side crane owned and operated by Ryan-Walsh would then lift the billets and coils into the barge, where longshoremen employed by Ryan-Walsh would position and stow the cargo; ILA Union checkers were hired by Ryan-Walsh to attend throughout the loading process to keep a tally of the cargo loaded, and from that tally, a "mate's receipt" would be prepared and delivered to the tug captain who, by his signature thereon, would acknowledge receipt of the cargo "in good order and condition." The "mate's receipt" indicated the total quantity and approximate weight of cargo loaded by Ryan-Walsh.

The actual method of loading and stowing utilized by Ryan-Walsh was basically quite simple. Lengths of 4″ × 4″ rough sawn Southern Pine lumber would first be laid "athwartships" throughout the length of the barge's cargo hold, with these rows of lumber spaced approximately three to four feet apart. In addition, wooden 4″ × 4″ would also be placed against the sloped sides or "skin" of the hold to protect the barge from the steel cargo and vice versa. Having placed a "floor" of lumber dunnage thusly in the cargo hold, Ryan-Walsh then proceeded to load the cargo of steel billets first, this being the heaviest cargo.

38. The steel billets were loaded by means of a bridle-type sling and chains. This sling consisted of two cables, the end of one cable being joined together with the end of the other and hooked to the end of the crane cargo cable; the free or running ends of the wires had hooks attached. Two heavy (23,000 lb. test) chains, each having oblong rings at either end, were used with this bridle. In order to lift the billets, one chain would be looped around one end of a group of approximately sixteen billets, and the other chain would be looped around the other end of that group, usually while the billets were still on the truck. The oblong ring at one end of the chain was then run through the ring at the other end, and then hooked to the hook on the end of the bridle, so that when the bundle was lifted, the chains would pull tight around them, bundling them up in a group. This bundle of billets would then be lifted from the dock to the hold of the barge by the shore-side crane.

39. The actual stowage of the billets commenced in the forward end of the barge and worked aft, being loaded "wing-to-wing" or side-to-side. The first draft or load of billets was lowered into the forward end of the barge and laid in a fore and aft direction against the wooden 4″ × 4″s protecting the side of the barge, and on the rows of 4″ × 4″s on the barge's floor. To insure that the billets were tight against the 4″ × 4″s against the side of the barge, the chains around the bundle of billets were hooked up in such a way that when the billets came to rest in the hold, the "outboard" ends of the chains were unfastened so that when the chains were lifted out, the billets would tend to fall in an outboard direction towards the side of the barge.

40. Having placed the first bundle of billets in the hold, the longshoremen would then place 4″ × 4″ wooden "spacers" (approximately 2′–3′ in length) upright along the length of that bundle, every three or four feet, to separate this bundle of billets from the next. This separation was done to facilitate discharging the billets in a similar fashion at their destination and, as noted above, had been specifically requested by

Georgetown Steel in response to a similar request from its customers in San Juan.

41. Having placed these spacers, the next load of billets would be lowered into the hold in position flush against the spacers separating the first load. This procedure was followed, alternating from port to starboard to avoid excessive list, all the way across the deck, giving a solid row of bundles from one side to the other. Another row of bundles would then be loaded in a similar fashion aft of this first row, and continuing aft until the length of the cargo hold had been exhausted.

42. Having completed a tier or layer of bundles of billets, the stevedore repeated the same procedure over again with a second layer, after first flooring off the first tier by the placement again of the rows of wooden 4″ × 4″s.

43. No excessive void spaces were left between the rows of billets, but rather, where necessary to eliminate such voids, the billets of one row were overlapped with the billets of another so as to "tie in" the various rows and insure an equal distribution of weight throughout the hold of the barge. This weight distribution was pre-planned by taking Georgetown Steel's estimate of the approximate number of billets to be loaded and estimating the approximate number of billets to be placed in each area of the barge hold. The checkers who were counting the billets as they were loaded would advise the stevedore superintendent as to the running count of billets going in so that the superintendent could gauge the even distribution of the cargo. The care which the stevedore took in equally distributing the weight of the billets throughout the barge is established by the documentary evidence indicating that roughly 600 billets were to be placed in each third of the cargo hold.

44. Having completed the loading of the billets, this cargo was then floored off, again with the same type of lumber dunnage, in preparation for the loading of the steel coils. The steel coils were loaded on top of the billets, using the same "wing-to-

wing" method. They were positioned in the hold in a fore-and-aft manner; that is, with the "eyes" of the coils running fore and aft. The coils were loaded by means of a specially designed lifting bridle which enabled the stevedore to lift as many as four (4) master coils (eight single coils) at a time. Given the diameter of the coils and the width of the barge, there was room for a row of eight coils across. This row of coils was then "locked" in place by inserting an extra coil in the "chime" or "v" formed by the meeting of the two coils, or by a coil and barge side, as the case might be. The weight of this additional coil would apply outward force on the other coils it was resting upon and cause those coils to be "locked in" to the row between either side of the barge. There was testimony, and I so find, that this "locking" tendency was enhanced by the natural characteristic of the wire coils themselves, whereby the pressure of the coiled strands of wire against each other acted as interlocking "fingers" and further negated the likelihood of any shifting. In other words, the more the barge "worked" during a voyage, the tighter the stow of coils actually became.

45. The above procedure for loading coils was used throughout the length of the barge. Based on the number of coils carried, I find that one entire tier of coils would have been loaded on top of the billets, and a portion of a second tier was loaded in the forward and aft halves of the barge. At no time during the loading of the coils or billets by Ryan-Walsh did either the tug captain or Georgetown Steel dock personnel, all of whom were present and observing the manner of loading from time to time, make any complaint whatsoever about the method of loading, the appearance of the stow, or the care being taken in the handling of the cargo.

46. The loading of the barge, as described above, was continued around the clock and was completed at 1330 hours on Saturday, September 28. The checkers' tallies reflected that a total of 1803 billets, weighing approximately 4,200,000 pounds or 1875 long tons, had been loaded. In addition, the checkers' tallies reflected that a total of 682 coils, or 341 master bundles, weighing approximately 682 long tons, had been loaded. Although there was some discrepancy raised in the checkers' tallies as to exactly where in the barge the various quantities of billets and coils were located, I am satisfied by the live testimony of the Ryan-Walsh superintendents, supported by the testimony of Mr. Fred Detwiler, traffic manager of Georgetown Steel at the time, that the weight of the billets was evenly distributed throughout the cargo hold of the barge, and I so find.

47. The total weight of the cargo as first completed was approximately 2557 long tons. The evidence reflects, and I so find, that with this quantity of cargo on board, the RMC 100 should not have been overloaded. Based upon her assigned loadline and freeboard, she had more than adequate deadweight capacity to carry this cargo. In fact, Mr. Woodward, her designer, testified that she was not overloaded with that quantity on board. Ryan-Walsh, therefore, had no reason to suspect that the barge was overloaded with this weight in her.

48. The above facts notwithstanding, on Saturday, September 28, upon inspecting the barge prior to sailing, Captain Hudgins testified that he could not see the barge's load line or "plimsol" mark and therefore concluded that the barge was overloaded. He contacted his company office in Norfolk, where the plans and the specification on the barge were on hand, and after giving them certain draft readings, received instructions from them to have the stevedore remove seventy-eight long tons of cargo. It appears that this figure was arrived at by computing the weight of the hatchcovers. However, as set forth above, it is clear that the barge should not have been overloaded with the original cargo on board, and the court can only conclude that Captain Hudgins was mistaken in his determination that the barge was too deeply laden.

49. Nevertheless, in compliance with Captain Hudgins' instruction, Ryan-Walsh did, on Sunday evening, September 29, re-

open the barge, which had already been secured for sailing on the previous day, and removed 78 coils (39 master bundles) weighing a total of 78 long tons. The evidence indicates, and I so find, that these coils were removed from the forward hatch opening of the barge, so as not to disturb the already established draft and one foot "drag" previously requested by Captain Hudgins. Although there was some speculation that removal of these coils may have created some void spaces which later permitted shifting, the evidence convinces me that the coils were removed as loaded, row for row, in a careful and prudent manner so as not to disturb the overall tight integrity of the stow.

50. Upon removal of the 78 tons in accordance with the captain's instructions, the hatches were again put in place.

51. As is usual in cases of this type, the experts were in conflict as to whether the manner of loading the steel products on board the RMC 100 by Ryan-Walsh was proper and in accordance with accepted stevedoring practices. However, the preponderance of the evidence and the most persuasive of the expert testimony convinces me that the stowage of the barge was entirely workmanlike and proper. I was particularly impressed with the opinion testimony of Captain Edward Greenwood, a marine surveyor with many years experience in supervising the loading, carrying and discharging of all types of steel products, including billets and wire coils of the type involved here. He was the only expert to testify who had actually observed Ryan-Walsh loading steel products in Georgetown, and I was impressed with his familiarity with stevedoring practices in general. Georgetown Steel's expert, Captain Doane, also had extensive experience in the ocean transportation of steel products, but this was in the capacity as an officer on board vessels and not in the shoreside supervision of stevedores. Furthermore, Captain Doane testified that in his experience, if he was dissatisfied with the method of stowing cargo, he would inform the stevedore and have them correct the deficiency prior to sailing. The fact that Captain Hudgins

made no such complaints to Ryan-Walsh only further reinforces my conclusion that the manner of stowage must have been satisfactory. Additionally, two of Georgetown Steel's own former employees, Mr. Detwiler and Mr. James Meek (a dock superintendent), both testified that they had previously loaded these products on barges in the same fashion and that they had no complaint about Ryan-Walsh's practice of loading.

52. The logical and careful manner in which Ryan-Walsh loaded the steel, the fact that they had utilized this loading method with the full knowledge and approval of Georgetown Steel and its San Juan customers on numerous occasions both before this voyage and subsequent thereto, the absence of any complaint from Georgetown Steel or Captain Hudgins about the manner of loading or the condition of the stow upon completion, the lack of any tangible evidence of shifting prior to the barge's sinking, and the persuasive expert testimony of Captain Greenwood, all lead me to the inescapable conclusion that Ryan-Walsh fulfilled its obligation to load the cargo in the RMC 100 in a reasonable and workmanlike manner in accordance with accepted stevedoring practices, and I so find.

53. The water at the pier in Georgetown, South Carolina, is brackish; that is, a combination of salt and fresh water, and was of unspecified density on the date of loading and at the times when drafts were read.

54. Employees of Georgetown Steel routinely inspected the barge at Georgetown, S. C., on her return from voyages and occasionally at discharge ports. Voyage repairs were made as necessary, including the repair of hatch dogs and hatch gaskets where indicated.

55. The Barge RMC 100 was in all respects seaworthy and Georgetown Steel exercised due diligence to make her so.

56. The Tug HERON logbook for September 30, 1974, reflects "0415 off and underway Barge CRM 100" (sic); 0525 underway for San Juan, P.R.;" and "1130

Georgetown sea bouy" (Plaintiff's Ex. # 1). Captain Hudgins checked the marine weather forecast on his VHF and decided that the forecasts were satisfactory to begin the voyage. He made the tug up alongside the barge to get underway from the dock and soon thereafter streamed the barge to a "short hawser" of approximately seventy-five feet. Once clear of the sea buoy, at about 1130 on September 30th, he streamed his tow to 1500′ on the hawser.

57. The weather was fair and the voyage uneventful until the weather worsened on October 3rd, when the log reflects "Wind Northeast 20–25, Seas 8–10 foot." The weather continued to worsen on October 4th, when Captain Hudgins decided to change course from 130° to 192° to bring the flotilla closer to the Bahamas while riding out the weather.

58. During the course of the storm on October 4th, the flotilla experienced moderate pitching and rolling. Pitching was defined as movement up and down along the length of the barge; rolling was defined as a movement side-to-side.

59. On the evening of October 4th, moving into the morning of October 5th, Captain Hudgins noticed an increasing severity of the weather expressing itself in increased wind speed and wave height. Captain Hudgins continued to make way in the "heavy" weather until sometime on October 5th when he determined that the weather was too severe to continue on his intended track and he decided to "heave to." He defined "heaving to" as heading the flotilla directly into the wind and waves, to the greatest extent possible, and maintaining sufficient power on the tug to not lose ground, but essentially to remain stationary in the water.

60. Captain Hudgins remained "hove to" from the time he took that action until approximately 0900 on the morning of October 6th, a period in excess of eight hours. During the time in which he was "hove to" the tug and barge maintained their positions in the increasing storm, generally pitching as the seas hit the barge on the bow.

61. The *Mariners Weather Log*, March 1975, Volume 19, No. 2, a publication of the National Oceanic and Atmospheric Administration, Environmental Data Service, reported at page 101 as follows:

At 1200 on the 5th, the MARJORIE LYKES was off the east coast of Florida, at 27.8°N, 97.7°W [sic; read 79.7°W], with 45–kt winds and 20–ft seas. A LOW developed on the front over eastern Cuba, on the 5th, and moved northward off the east coast of Florida by the 7th. On the 6th, 7th, and 8th, the GULF-CREST, MARJORIE LYKES, MOBIL LUBE, SOCONY VACUUM, and the USCGC COURAGEOUS, all fought 42– to 48–kt winds from the northeast. The seas were running up to 20 ft, and the swells to 26 ft. The LOW dissipated on the 8th.

62. On the evening of October 5, 1974, at approximately 1900–2000 (local time) the SS MARJORIE LYKES was at position Latitude 28.2°N, Longitude 73.8°W (which is in proximity to the location of the Tug HERON at the same time) and experienced winds from the northeast at forty-five knots and waves with an average height of nineteen and five/tenths feet from the same direction as the winds.

63. The SS SOCONY VACUUM in position Latitude 28.6°N, Longitude 79.9°W (in proximity to the Tug HERON at the same time) experienced winds from the northeast at forty-five knots and seas with an average height of fourteen and five/tenths feet from the northeast and twenty-three foot swells from the north-northeast at 0700–0800 on the morning of October 6th, at about the time the Barge RMC 100 capsized nearby.

64. On October 5, 1974, at approximately 1900–2000, the USCGC COURAGEOUS was at Latitude 26.1°N, Longitude 78.0°W, in the lee of Bahama Island and Great Abaco Island, between the coast of Florida and the Bahamas, where it experienced winds from the northeast at forty-two knots, as measured by anomometer, and seas with an average height of thirteen feet.

65. On October 5, 1974, at approximately 1900–2000, the SS GULFCREST was at Latitude 28.7°N, Longitude 80.1°W, near Cape Kennedy, experiencing winds from the northeast at forty-eight knots and seas with an average height of eleven and five/tenths feet.

66. At 0900 on October 6, 1974, the engineer advised Captain Hudgins that due to the reduced speed-made-good in heavy weather, they would not have enough fuel to reach San Juan even if the wind calmed completely. Captain Hudgins had originally planned eight to nine days to make the trip and estimated that the tug carried a sixteen to seventeen day fuel supply. He decided to change course from 192° to 295° or 300° to go to Cape Kennedy to refuel before continuing the voyage. He made his turn slowly and easily, without any trouble, turning to starboard and increasing speed to half throttle after the turn. Less than fifteen minutes after the turn, Captain Hudgins felt a surge or jolt, as if someone had run up from behind him in a chair and pushed him. He and the crew looked back and the barge was gone. There was only a spot of green water where the barge had been. The crew went aft and burned the cable.

67. There was no indication that the barge was taking water inside prior to her sinking. Before and after the weather worsened on October 3rd, the barge was riding well in the water. Water was breaking across the deck of the barge at times and the barge was rolling normally given the weather conditions. There was nothing unusual about the barge's movements during the several hours before she was lost. Prior to the turn, the wind was from the east-northeast, approximately 50°, and the seas were coming from the same direction at heights estimated to be fifteen feet to twenty feet. The seas were striking the barge on her port quarter. After the turn, the wind and seas were striking the barge on her starboard side. This was the largest course change during the trip. The barge sank without warning. Captain Hudgins testified that a "freak wave" or "queer sea" hit the barge after the turn.

68. Although meteorological experts have attempted to plot the course and pattern of the seas, there occur wave patterns which cannot be predicted and which cannot be precisely defined. Those wave patterns, which often strike randomly and indiscriminately, are referred to variously by mariners as "freak" waves or "queer" seas. Essentially, by definition, they occur randomly throughout a storm and may be exaggerated to several times the expected wave height and severity.

69. Although there was much speculation at trial as to what actually caused the barge to go down, the one uncontradicted fact remains that the barge, despite rolling and pitching heavily in high seas for some three days before the loss, was observed by Captain Hudgins to be riding in a satisfactory condition, without any list whatsoever, prior to the fateful turn, and that within moments after initiating this turn, the barge was gone. It was the opinion of Captain Hudgins that the barge had "broken in two on a queer sea." Though admittedly speculation, the same can be said of the opinions of the various experts who testified on this question, and Captain Hudgins was, after all, the only one of these witnesses who was actually present when the loss occurred. As I do not believe that the evidence supports a finding of a shifting of cargo, I am of the opinion that the most plausible explanation for the sinking of the barge was that during the storm on October 6, 1974, the RMC 100 encountered an Act of God or peril of the sea in the form of a queer sea or freak wave, which caused her to break in half and sink.

70. The Tug HERON was properly manned and equipped and seaworthy for the proposed towage of the Barge RMC 100 from Georgetown, South Carolina, to San Juan, Puerto Rico. The master of the Tug HERON, Kenneth Hudgins, and the tug crew exercised reasonable care in the navigation of the tug and tow from Georgetown, South Carolina, and I so find.

## CONCLUSIONS OF LAW

1. This is an admiralty action, and the court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1333.

2. The parties are subject to the personal jurisdiction of this court.

3. Ferromontan was the holder of the bills of lading and the titled owner of the steel cargo laden aboard the Barge RMC 100.

4. Otto Wolff had paid for and was the beneficial owner of the steel cargo laden aboard the RMC 100.

5. Gerling-Konzern paid a total loss under its policy issued on the steel cargo laden aboard the RMC 100 and is subrogated to the rights of Ferromontan and Otto Wolff. As subrogee, it has no greater rights than the persons from whom it obtained them by subrogation.

6. La Industrial was not a holder of the bill of lading or any other document of title to the steel cargo laden aboard the RMC 100. It had not paid for any of the steel aboard the RMC 100 and had no legal or beneficial interest in it. La Industrial never acquired an interest in the goods sufficient to give it standing to sue for the loss. La Industrial has no right to recover for the lost cargo, and its claim is dismissed. *Pollard v. Vinton*, 105 U.S. 7, 26 L.Ed. 998 (1881); *Columbia Trading Corp. v. Moore-McCormack Lines, Inc.*, 374 F.2d 864 (2d Cir. 1967).

7. Caribe Steel was not a holder of the bill of lading or any other document of title to the steel cargo laden aboard the RMC 100. It had not paid for any of the steel aboard the RMC 100 and had no legal or beneficial interest in it. Caribe Steel never acquired an interest in the goods sufficient to give it standing to sue for the loss. Caribe Steel has no right to recover for the lost cargo and its claim is dismissed. *Id.*

8. Ferromontan, as holder of the bill of lading and agent for Otto Wolff; Otto Wolff, who paid for the steel, and Gerling-Konzern, who became subrogated to the rights of Ferromontan and Otto Wolff, are the only persons having standing to sue for the loss of the steel. *Pollard*, 105 U.S. 7, 26 L.Ed. 998. Otto Wolff is not before the court as a party to this suit. Gerling-Konzern is not before the court as a party to this suit.

9. Otto Wolff/Ferromontan contracted with Georgetown Steel to insure the cargoes shipped between them, covering the interests of Georgetown for the same risks which Georgetown had previously been insuring. The contract to insure was for the mutual benefit of both parties and was supported by fair and adequate consideration. Otto Wolff/Ferromontan (plaintiffs) failed to procure the insurance coverage as they contracted to do and breached their contract with Georgetown Steel.

10. The loss for which plaintiffs' brought this claim would have been covered by insurances which Georgetown Steel previously had effected and could in the instant case have effected had it known that Otto Wolff/Ferromontan was not performing its part of the contract to insure. Georgetown Steel's exposure to liability and need to defend against this subrogation claim of Gerling-Konzern is due solely to Otto Wolff/Ferromontan's breach of its (their) contract to insure.

11. Under its contract with Ferromontan, Georgetown Steel is entitled to the benefit of Ferromontan's insurance. *The JOHN RUSSELL*, 68 F.2d 901 (2d Cir. 1934). Ferromontan is not entitled to recover from Georgetown Steel due to Ferromontan's failure to procure the required insurance, and its claim is dismissed. *Bradley Freight Lines, Inc. v. Pope Flynn & Co.*, 42 N.C.App. 285, 256 S.E.2d 522 (1979); *Cook-Davis Furniture Co. v. Duskin*, 134 Ga.App. 264, 214 S.E.2d 565 (1975); *First Nat'l Bank and Trust Co. of Woodbury v. Evans*, 11 N.J.Misc. 19, 163 A. 667 (1932); J. Appleman, *Insurance* §§ 2269–2270 (1969).

12. Raw Materials, as owner of the Barge RMC 100, had no responsibility for the repair, maintenance, or operation of the RMC 100. The barge was under bareboat charter to Georgetown Steel and Raw Materials played no part whatsoever in the booking of cargoes aboard the barge, the loading or contracting for loading of cargoes into the barge, the issuance of bills of

lading for shipments on the barge, or the towing or contracting for towing of the barge. In short, Raw Materials owed no duty to plaintiffs by virtue of its ownership of the barge and it breached no duty to plaintiffs. Plaintiffs' claims against Raw Materials are dismissed. *Reed v. SS YAKA*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1962); *Nat G. Harrison Overseas Corp. v. American Tug TITAN*, 516 F.2d 89 (5th Cir. 1975). *See, Yeramex Int'l v. SS TENDO and SS LINDO*, 595 F.2d 943, 1979 A.M.C. 1282 (4th Cir. 1979), *rev'g* 1977 A.M.C. 1809 (E.D.Va.1977).

13. The defendant Georgetown Steel chartered the Barge RMC 100 from its owner, Raw Materials, and contracted with the defendant Allied Towing to tow the barge. Georgetown Steel, however, issued and signed the bills of lading as the "carrier," and therefore assumed responsibilities for safely transporting and delivering the cargo as defined in the Harter Act, 46 U.S.C. §§ 190–196.

14. Georgetown Steel, as carrier, having issued a clean bill of lading evidencing receipt of the cargo in apparent good order and condition, is prima facie liable for the loss of the cargo and has the burden of making proof sufficient to rebut plaintiffs' claim. *American Tobacco Co. v. THE KATINGO HADJIPATERA*, 81 F.Supp. 438, *aff'd* 194 F.2d 449 (2d Cir. 1951), *cert. denied*, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952).

15. Inasmuch as the voyage in question involved the transportation of goods from one port in the United States to a port in a U.S. Territory, the rights of the parties are governed by the provision of the Harter Act, 46 U.S.C. §§ 190–196.

16. A prima facie case having been made out by the plaintiffs, it was incumbent upon defendant Georgetown Steel, as carrier, to prove that the cause of the loss fell within a statutory or contractual exception against liability. *See, J. Gerbert & Co. v. SS SABINE HOWALDT*, 1970 A.M.C. 441 (S.D.N.Y.1969); Gilmore and Black, *The Law of Admiralty*, 2d Ed. (1975), 183–185.

17. The cause of the capsizing and sinking of the Barge RMC 100 with the total loss of its cargo was due to an Act of God or peril of the sea, for which Ferromontan is not entitled to recover under Section 3 of the Harter Act, 46 U.S.C. § 192. *Automobile Ins. Co. v. Hart-Wood Lumber Co.*, 105 F.2d 387 (9th Cir. 1939); *Paul Marsh, Inc. v. SS JOHANN BLUMENTHAL*, 455 F.Supp. 236 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 998 (2d Cir. 1979); *Cobb v. United States*, 471 F.Supp. 102 (M.D.Fla.1979); *Jordan Int'l Co. v. Federal Commerce & Nav. Co.*, 1975 A.M.C. 130 (S.D.N.Y.1974); *Duble v. Canadian Pacific SS Co. (The EMPRESS OF FRANCE)*, 49 F.2d 291 (E.D.N.Y.1930); *Duche v. Thomas & John Brocklebank, Ltd.*, 35 F.2d 184 (E.D. N.Y.1929).

18. As part of its contractual and statutory obligations, the Master of the tug, as an agent and servant of the carrier Georgetown Steel, was the supreme authority with respect to all details of the voyage and, as such, had the final say as to stowage, not only because of the carrier's responsibility for the stability of the tug and barge and the safety of the vessels and crew, but by virtue of the carrier's obligation to properly and carefully load, stow, care for and deliver the goods carried. 46 U.S.C. § 190; *Olsen v. United States Shipping Co.*, 213 F. 18, 21 (2d Cir. 1941).

19. Defendant Ryan-Walsh, as a contract stevedore, had an implied obligation "to perform their services properly and with reasonable safety." *St Paul F. & M. Ins. Co. v. SS TRINITY*, 1967 A.M.C. 1768 (C.D.Cal.1967).

20. Although stowage of cargo is to be done "properly and carefully," the decisions reflect a reasonable, "less than perfect" standard. Judge Learned Hand, in the leading case of the *SILVERSANDAL*, [*Bache v. Silver Line*] 110 F.2d 60 (2d Cir. 1940), in a thoughtful discussion of the balancing of interests of the question of stowage, set forth the following standard:

In the carriage of goods, the trade must always come to some accommoda-

tion between ideal perfection of stowage and entire disregard of the safety of the goods; when it has done so, that becomes the standard for that kind of goods. Ordinarily it will not certainly prevent any damage, and both sides know that the goods will be somewhat exposed; but if the shipper wishes more, he must provide for it particularly.

*Id.* at 62. In accordance with this standard, it has been held that even though another loading method may be practical, or even preferable, if the method under scrutiny conforms with the above standard, it is held not to be improper. *See, e.g., Master Shipping Agency, Inc. v. MS FARIDA,* 1976 A.M.C. 91 (S.D.N.Y.1975).

21. The preponderance of the evidence establishes that the cargo was loaded in a reasonable manner in accordance with accepted industry standards.

22. Consistent with the findings of fact above, neither Argonaut, Georgetown Steel nor Harbor Insurance Company is legally obligated to pay plaintiffs for the losses alleged.

23. The loss at issue occurred outside of the United States of America, its territories or possessions of Canada. This fact triggers the escape clause contained in the Argonaut policy. Escape clauses similar to the one here considered have been given effect, even where another policy involved contained a less restrictive "other insurance" clause. The court in *Viger v. Geophysical Services, Inc.,* 338 F.Supp. 808 (W.D.La.1972), *aff'd,* 476 F.2d 1288 (5th Cir. 1973), *rehearing denied,* 478 F.2d 1403 (5th Cir. 1973), gave effect to an escape clause, absolving one insurer of the burden of payment at the expense of the other. There a seaman brought a Jones Act claim against his employer and the owner of the vessel upon which he was working when injured. Plaintiff's employer was responsible for all plaintiff's injuries. The owner was an insured of both a policy which it procured and one which the owner of the vessel had procured. Both afforded liability coverage for the type of injury suffered by plaintiff. However, the vessel policy contained a clause virtually identical to the escape clause here at issue. The owner policy contained a pro-rata clause, providing that where other insurance covered the loss, each policy should bear a pro-rata share of the loss. The court excused the vessel policy from any duty of payment due to the escape clause upholding the sanctity of the contract and noting that "[c]lauses in insurance policies must be given effect where possible." *Id.* at 812. *See also, United States Fidelity & Guaranty Co. v. Dixie Auto Insurance Co.,* 292 F.Supp. 554 (N.D. Ala.1968), *aff'd,* 403 F.2d 717 (5th Cir. 1968) (endorsement on automobile dealer's policy providing coverage if no other valid and collectible insurance, either primary or excess, given effect due to existence of driver's policy); *Allstate Insurance Co. v. Shelby Mutual Insurance Co.,* 269 N.C. 341, 152 S.E.2d 436 (1967) (the court enforced an escape clause in the owner's primary policy and shifted the burden to the excess carrier where the insured was an unnamed insured; the court there noted that an insurance policy is nothing more than a contract, the clear terms of which must be given effect absent statutory provision to the contrary); *Continental Cas. Co. v. Weekes,* 74 So.2d 367 (Fla.1954) (an escape clause in auto owner's primary policy forced payment of loss by the excess carrier).

Although some courts have either refused to give effect to escape clauses or have treated them as pro-rata clauses, *see,* 46 A.L.R.2d 1163 (Later Case Service) (1980), the facts here justify giving effect to the one contained in Argonaut's Endorsement 3. First, the insured, Georgetown Steel, a sophisticated industrial entity, should be charged with the terms of its contract, and they should be given effect. Second, Georgetown Steel is not harmed by the clause, being protected totally by Harbor Insurance Company's obligation to pay and defend. Third, Harbor Insurance had notice of the existence of the Argonaut policy as is evidenced by its "Schedule of Underlying Insurance."

As a result of the escape clause contained in Argonaut's Endorsement 3, Argonaut

was justifiably excused from undertaking the defense of Georgetown Steel.

24. In addition, even if the Argonaut policy covered the loss here at issue, its limits of $100,000.00 afford coverage for only one/ninth of it. As a result, there was a concurrent duty on the part of Harbor Insurance Company to defend and pay. No duty of payment exists. Since Harbor Insurance undertook the defense on behalf of Georgetown Steel, there is no entitlement of reimbursement for the expense of defense or other damage. *See, Sloan Construction Co. v. Central National Insurance Co. of Omaha*, 269 S.C. 183, 236 S.E.2d 818 (1977).

Based on the above findings of fact and conclusions of law, it is, therefore,

ORDERED, that plaintiffs shall take nothing by way of damages, costs, or attorney's fees. It is

ORDERED FURTHER, that defendants Georgetown Steel Corporation and Raw Materials Corporation shall take nothing by way of damages, costs, or attorney's fees on their third-party claim against Ryan-Walsh Stevedoring Company, Inc. It is

ORDERED FURTHER, that defendant Georgetown Steel Corporation shall take nothing by way of damages, costs, or attorney's fees on its crossclaim against Argonaut Insurance Company. It is

ORDERED FURTHER, that defendant Allied Towing Corporation shall take nothing by way of damages, costs, or attorney's fees on its crossclaim against Georgetown Steel Corporation.

The Clerk is directed to enter on the rolls of this court a judgment in accordance with the terms of this order.

AND IT IS SO ORDERED.